UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

THOMAS LEE GUDINAS,

                    Petitioner,

vs.                                Case No.  2:06-cv-357-FtM-36DNF

WALTER A. McNEIL, Secretary, Florida
Department of Corrections and
WILLIAM MCCOLLUM, Attorney General
of Florida,

                    Respondents.[1]
_____

### OPINION AND ORDER

    This matter is before the Court on Petitioner Thomas Lee
Gudinas' (hereinafter "Petitioner" or "Gudinas") Amended Petition
for Writ of Habeas Corpus under 28 U.S.C. § 2254 (Doc. #25,
Petition) and Memorandum of Law in Support of Amended Petition for
Writ of Habeas Corpus (Doc. #26, "Memorandum").  Respondents have
filed a Response to Petition (Doc. #31, Response), supported by
exhibits (Doc. #33, "Exh.").  Petitioner filed a Reply to the
Response (Doc. #41, Reply).

_____

    [1]Pursuant to Rule 25(d)(1) of the Federal Rules of Civil
Procedure, Walter A. McNeil, the current Secretary of the Florida
Department of Corrections, is substituted as the proper party
Respondent in place of Michael W. Moore, and William McCollum, the
current Attorney General of Florida, is substituted as the proper
party respondent in place of Robert Butterworth.

Upon review of the record, the Court determines that the Petition should be dismissed in part as procedurally defaulted and that relief should otherwise be denied.

## I. PROCEDURAL HISTORY

### A.  Trial and Sentence (Orange County Case No. CR94-7132):

On June 18, 1994, based upon an Affidavit for Arrest Warrant, the Ninth Judicial Circuit Court in Orange County, Florida issued an arrest warrant charging Gudinas with, *inter alia*, the May 24, 1994 murder and aggravated sexual battery of Michelle Anne McGrath. Exh. A11 at 199-206.  Gudinas was arrested on June 30, 1994.  *Id.* at 07-08.  On July 15, 1994, the Ninth Judicial Circuit Grand Jury indicted Gudinas for: one count of attempted burglary with an assault of Rachelle Smith (count I); one count of attempted sexual battery of Rachelle Smith (count II); two counts of sexual battery of Michelle McGrath (counts III and IV); and, one count of murder in the first degree of Michelle McGrath (count V).  *Id.* at 209-10.

Petitioner entered a written plea of not guilty and waived his speedy trial rights.  *Id.* at 233-236.  Due to extensive media coverage, Petitioner's motion for change of venue was granted, and Gudinas' trial was transferred to the Twentieth Judicial Circuit, in and for Collier County, Florida.  Exh. A12 at 411, 415.  On May 1, 1995, a jury trial before the Honorable Belvin Perry, Jr. commenced.  Exh. A14.  The Florida Supreme Court accurately

summarized the underlying facts that were presented during the
trial in Petitioner's direct appeal:

> Gudinas and three of his roommates arrived at an Orlando
> bar, Barbarella's, between approximately 8:30 and 9 p.m.
> on May 23, 1994.  Prior to arriving at the bar, the group
> drank beer and smoked marijuana at their apartment and in
> the car on the way to the bar.  While drinking throughout
> the night, Gudinas and his roommates periodically
> returned to their car to smoke marijuana.  However, when
> the bar closed at 3 a.m Gudinas could not be located.
> One of Gudinas' roommates, Todd Gates, testified that he
> last saw Gudinas in the bar at approximately 1 a.m.
>
> Rachelle Smith and her fiancé arrived at the same bar
> between 11 and 11:30 p.m.  They stayed until about 2 a.m.
> Rachelle left the bar at that time, while her fiancé
> remained inside saying goodbye to friends.  She initially
> went to the wrong parking lot where she saw a man
> watching her while crouched behind another car.
> Realizing she was in the wrong parking lot, Rachelle
> walked to the lot where her car was parked.  Because she
> felt she was being followed, she immediately got into her
> car and locked the door.  Looking into her mirror, she
> saw the same man she had just seen crouched behind a car
> in the other parking lot.  After trying to open
> Rachelle's passenger side door, the man crouched down,
> came around to the driver's side and tried to open the
> door.  While screaming at Rachelle, "I want to f___ you,"
> the man covered his hand with his shirt and began
> smashing the driver's side window.  Rachelle blew the
> horn and the man left.  Upon hearing of the murder that
> occurred nearby that same night, Rachelle contacted
> police, gave a description of the man, and identified
> Gudinas from a photographic lineup as the man who tried
> to attack her. [FN 1] She also identified Gudinas at
> trial.
>
>> [FN 1] Two other witnesses, Culbert Pressley
>> and Mary Rutherford, also positively
>> identified Gudinas from the same photo lineup.
>> They had each seen Gudinas near the scene of
>> the murder later that morning.
>
> The victim, Michelle McGrath, was last seen at
> Barbarella's at approximately 2:45 a.m.  She apparently

had left her car in the same parking lot where Rachelle
Smith first saw Gudinas crouching behind a car.  Between
4 and 5 a.m., Culbert Pressley found Michelle's keys and
a bundle of clothes next to her car in the parking lot.
[FN 2]  Her body was discovered at about 7:30 a.m. in an
alley next to Pace School. [FN 3]  Michelle was naked,
except for a bra which was pushed up above her breasts.


[FN 2] Several hours later, shortly after 7
a.m., a man whom Pressley subsequently
identified as Gudinas came walking down the
sidewalk.  When the man saw Pressley holding
the car keys, he said, "Those look like my
keys.  I've been looking for them all
morning."  Pressley gave him the keys in
exchange for a promised $50 reward.  The man
then walked away.


[FN 3] Pace School employee Jane Brand
discovered the victim in the alley.  In the
preceding half hour before seeing Michelle's
body, Ms. Brand had arrived at school and
encountered a young man inside the gated area
on the steps leading to the school's front
door.  The man, whose back was to Ms. Brand,
remained seated and did not look at her.  She
described him as about eighteen years old with
short brown hair and wearing dark, loose-
fitting shorts and a loose shirt.  After being
told to leave the school grounds, the man
jumped the fence and ended up in the alley.
About ten minutes later, Ms. Brand heard a
loud crash in the alley.  She looked outside
and saw Michelle's body.  She later identified
Gudinas as the same man she saw in the
courtyard that morning after seeing him in a
television report.

Jane Brand flagged down Officer Chisari of the Orlando
police bicycle patrol.  Officer Chisari had been informed
by a deputy sheriff on the scene that Pressley had found
some keys.  Pressley then told Chisari he had just given
them to "that guy," referring to a man walking south.  As
Chisari then rode toward the man, Ms. Brand screamed as
she spotted Michelle's body.  Chisari returned to where
Ms. Brand was.  Subsequently, he saw a man he later

identified as Gudinas driving a red Geo Metro from the parking lot where Michelle had parked her car. Pressley wrote down the car's license plate and the tag number was traced to Michelle McGrath. The car was later recovered at 7 p.m. that night at the Holiday Club Apartments. [FN 4]

> [FN 4] Gudinas' apartment was less than a half a mile from where Michelle's car was found.

During the jury trial, all four [FN 5] of Gudinas' roommates testified that he was not at their apartment when they returned from Barbarella's. Frank Wrigley said he next saw Gudinas that afternoon; he had blood on his underwear and scratches on his knuckles, allegedly from a fight with two black men who tried to rob him. Todd Gates testified that Gudinas was at the apartment when he awoke between 8:30 and 9 a.m., wearing boxer shorts covered with blood, allegedly from a fight with a black man. Fred Harris offered similar testimony. Fred added that later that day, after being asked if Michelle was "a good f___," Gudinas replied, "Yes, and I f___ed her while she was dead." Dwayne Harris likewise testified that he heard Gudinas say, "I killed her then I f___ed her."

> [FN 5] These were Frank Wrigley, Todd Gates, and brothers Fred and Dwayne Harris. The Harris brothers are Gudinas' first cousins.

Dr. Hegert, the medical examiner, testified that the cause of death was a brain hemorrhage resulting from blunt force injuries to the head, probably inflicted by a stomping-type blow from a boot. He found severe cerebral edema and determined that Michelle died thirty to sixty minutes after the fatal injury, the forceful blow to the head. Dr. Hegert also found defensive wounds on one of Michelle's hands and two broken sections of a stick, one inserted two inches into her vagina and the other inserted three inches into the area near her rectum. In addition, Dr. Hegert also determined that Michelle had been vaginally and anally penetrated by something other than the sticks, as indicated by trauma to her cervix. He also found that Michelle had a blood alcohol content of .17% at the time of her death. While Michelle might have lived longer without that amount of alcohol in her system, Dr. Hegert testified that the head injury would have been fatal anyway. He estimated the time of death to be between 3 and 5 a.m.

Timothy Petrie, a serologist with the Florida Department of Law Enforcement, testified that he found semen on the vaginal swab of Michelle's thigh.   Amanda Taylor, a latent fingerprint examiner with the Orlando Police Department, identified a latent fingerprint on the alley gate pushbar as Gudinas' right palm and thumbprints on Michelle's car loan payment book as Gudinas'.   Taylor acknowledged she had no way of knowing when the prints were made.

*Gudinas v. State*, 693 So.2d 953, 956-59 (Fla. 1997); Exh. E.

On May 4, 1995, the jury returned a verdict of guilty on all five counts.   Petition at 2; Exh. A12 at 538-42; A18 at 883-884. Additional facts will be set forth below as needed to resolve specific issues.

On May 8, 1995, the trial court commenced the penalty phase. Exhs. A19-20.   The jury, by a ten to two vote, recommended the imposition of a death sentence on Gudinas for the first-degree murder of Michelle McGrath.   Exh. A12 at 562; Exh. A20 at 341.

On June 16, 1995, the State trial court sentenced Gudinas, consistent with the jury's recommendation, to death for the first-degree murder of Michelle McGrath.   *See generally* Exh. A10, Exh. A12 at 601-03.   During sentencing, the State court identified three statutory aggravators: (1) the defendant had been convicted of a prior violent felony, section 921.141(5)(b). Fla. Stat. (1995); (2) the murder was committed during the commission of a sexual battery, section 921.141(5)(d); and (3) the murder was especially heinous, atrocious, or cruel, section 921.141(5)(h).   Exh. A10 at 5-16.   The court found one statutory mitigator: the defendant committed the

murder while under the influence of an extreme mental or emotional disturbance, section 921.141(6)(b). *Id.* at 16-21. The court found twelve nonstatutory mitigating factors and accorded them very little weight: (1) defendant had consumed cannabis and alcohol the evening of the homicide; (2) defendant had the capacity to be rehabilitated; (3) defendant's behavior at trial was acceptable; (4) defendant had an IQ of 85; (5) defendant was religious and believed in God; (6) defendant's father dressed as a transvestite; (7) defendant suffered from personality disorders; (8) defendant was developmentally impaired as a child; (9) defendant was a caring son to his mother; (10) defendant was an abused child; (11) defendant suffered from attention deficit disorder as a child; and (12) defendant was diagnosed as sexually disturbed as a child. *Id.* at 22-23. The court also sentenced Gudinas to thirty years for attempted burglary with an assault of Rachelle Smith (count I), thirty years for attempted sexual battery of Rachelle Smith (count II), and life imprisonment for each count of sexual battery of Michelle McGrath (counts III and IV). *Id.* at 25-26.

**B. Direct Appeal (Case No. 86-070)**

Petitioner, represented by court-appointed counsel, filed a direct appeal of his conviction raising the following twelve grounds of trial court error: (1) the trial court erred in denying Gudinas' motion to sever counts I and II pertaining to Rachelle Smith from the remaining charges; (2) the trial court erred in

conducting several pretrial hearings without Gudinas present; (3) the trial court erred in not granting Gudinas' motion for judgment of acquittal for the attempted sexual battery of Rachelle Smith; (4) the trial court failed to conduct an adequate inquiry after Gudinas complained about lead counsel; (5) the trial court erred in overruling Gudinas' objections and allowing graphic slides into evidence; (6) the trial court erred in allowing the State to bolster a witness' testimony with a hearsay statement; (7) the introduction of collateral evidence denied Gudinas his constitutional right to a fair trial; (8) the trial court erred in denying Gudinas' motion *in limine*; (9) the trial court erred in restricting Gudinas' presentation of evidence; (10) the jury's advisory sentence was unconstitutionally tainted by improper prosecutorial argument and improper instructions; (11) the trial court erred in finding the heinous, atrocious, or cruel aggravating circumstance; and (12) the trial court erred in its consideration of the mitigating evidence. Exh. B (direct appeal initial brief); *see also Gudinas v. State*, 693 So.2d 953, 959 n.8 (Fla. 1997); Exh E.

On April 10, 1997, the Florida Supreme Court affirmed Petitioner's convictions and sentences and denied his appeal. *Gudinas*, 693 So.2d at 968; Exh. E.  Petitioner's motion for rehearing was denied. Exhs. E2, E4.  On October 20, 1997, the United States Supreme Court (case number 97-5684) denied

Petitioner's petition for writ of certiorari. *Gudinas v. Florida*, 522 U.S. 936 (1997); Exh. F-3.

## C. State Post-Conviction Proceedings

### 1.    Rule 3.850 Motion

Petitioner filed a post-conviction motion pursuant to Florida Rule of Criminal Procedure 3.850 on June 5, 1998, an amended motion in July of 1999, and a second amended motion on September 30, 1999. Exh. G-3, the "Rule 3.850 Motion." Petitioner's Rule 3.850 Motion raised the following fifteen grounds for relief: (1) Defendant was deprived of his right to a reliable adversarial testing due to ineffective assistance of counsel at the guilt phase of his capital trial, the State's failure to disclose critical exculpatory evidence which was never presented to the jury, and highly improper and prejudicial prosecutorial and judicial misconduct; (2) Defendant was deprived of his right to a reliable adversarial testing due to ineffective assistance of counsel at the penalty phase of his capital trial because either the State failed to disclose or trial counsel was rendered ineffective by the State's actions and trial counsel failed to adequately challenge the State's case; (3) newly discovered evidence establishes that Gudinas' conviction and sentence were in violation of the Eighth and Fourteenth Amendments; (4) prosecutorial misconduct during the course of the case rendered Gudinas' conviction and death sentence fundamentally unfair and unreliable because the State presented

misleading evidence and improper argument to the jury; (5) Defendant was denied a fair trial because the State withheld evidence which was material and exculpatory in nature and/or presented misleading evidence; (6) Defendant was denied effective assistance of counsel and a proper direct appeal due to the lack of a complete record because his attorneys failed to object to the off-the-record discussions and their client's exclusion; (7) trial counsel was ineffective for failing to litigate that Florida's capital sentencing statute is unconstitutional on its face and as applied for failing to prevent the arbitrary and capricious imposition of the death penalty; (8) Defendant's sentence was tainted by improper instructions; (9) the trial court committed fundamental error by instructing the jury regarding the aggravating factor of heinous, atrocious, and cruel and the instruction was unconstitutionally vague; (10) the trial court unconstitutionally shifted the burden of proof in its instructions to the jury at sentencing; (11) Defendant's sentencing jury was misled by comments, questions, and instructions that unconstitutionally and inaccurately diluted the jury's sense of responsibility towards sentencing; (12) Defendant was denied a reliable sentencing because the sentencing judge refused and failed to find the existence of mitigation established by the evidence in the record; (13) Florida bar rule that prohibits Defendant's lawyers from interviewing jurors to determine if constitutional error was present is

unconstitutional; (14) execution by electrocution is cruel and/or unusual punishment; and (15) Defendant was denied a fair trial due to the cumulative effect of the errors made in his trial.  Exh. G-3 at 5-60.  The postconviction trial court held a *Huff*[2] preliminary hearing on October 16, 1999.  An evidentiary hearing was held on three of Petitioner's claims on December 17, 1999.  On March 20, 2000, the post-conviction court entered an order denying Petitioner relief on all grounds.  Exh. G-4; *State v. Gudinas*, Case No. CR 94-7132 (Fla. 9th DCA March 20, 2000).

Petitioner appealed the post-conviction court's order of denial to the Florida Supreme Court raising the following seven claims on appeal: (1) Petitioner was denied a full and fair evidentiary hearing; (2) the trial court erred in summarily denying Gudinas' claim that counsel's failure to object to the prosecutor's misconduct was unconstitutional; (3) the trial court erred in denying claim that counsel was ineffective at the sentencing phase; (4) the trial judge erred in finding that Gudinas' counsel was not ineffective at the guilt phase of the trial; (5) the trial court erred in not granting an evidentiary hearing so Petitioner could prove the rules prohibiting his lawyers from interviewing jurors to determine if constitutional error was present violate equal protection, and the First, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution; (6) the trial court erred by failing to

---

[2]*Huff v. State,* 622 So.2d 982 (Fla. 1993).

grant an evidentiary hearing so Petitioner could establish that Florida Statute 921.141(5) is facially vague and overbroad; and, (7) the Defendant was denied a fair trial due to the cumulative effect of the errors made in his trial. Exh. I at 1–97. The State filed a response. Exh. J. Petitioner filed a reply. Exh. K.

### 2.   State Habeas Petition

Simultaneously with the filing of his brief on appeal from the denial of his Rule 3.850 motion, Petitioner filed a state petition for writ of habeas corpus. Exh. M. Petitioner alleged that appellate counsel rendered ineffective assistance on direct appeal by failing to raise the following errors: (1) the prosecutor's misconduct during penalty phase closing argument rendered death sentence unreliable; (2) the trial court's errors in rejecting the statutory mitigator that Gudinas' ability to appreciate the criminality of his conduct or conform his conduct to the requirement of the law was substantially impaired; (3) the trial court's refusal to sever counts I and II from the remaining charges; (4) the Florida death sentencing statute is unconstitutional; (5) the cumulative effect of the errors made in his trial; and, (6) Gudinas may be incompetent at the time of execution thus violating his Eighth Amendment right against cruel and unusual punishment. *Id.* The State filed a response to Petitioner's State petition. Exh. N. Petitioner filed a reply. Exh. O.

On March 28, 2002, the Florida Supreme Court denied Petitioner relief on all grounds raised on appeal in his Rule 3.850 motion, and on all grounds raised in his State habeas petition. *Gudinas v. State*, 816 So. 2d 1095 (Fla. 2002); Exhs. L, P. Petitioner's motion for rehearing was denied. Exhs. P2, P4. Mandate issued on June 6, 2002. Exh. P5.

### 3.   Successive Rule 3.851 Motion

On October 18, 2002, Petitioner filed a successive motion for post-conviction relief pursuant to Rule 3.851 seeking relief, *inter alia*, pursuant to *Ring v. Arizona*, 536 U.S. 584 (2002). Exh. Q. The State filed a response. Exh. Q2. On January 13, 2003, the court denied Petitioner's Rule 3.851 motion. Exh. Q3. Petitioner filed an appeal. Exh. Q4. On May 13, 2004, the Florida Supreme Court denied relief. *Gudinas v. State*, 816 So. 2d 1095 (Fla. 2002); Exh. W. Petitioner's motion for rehearing was denied. Exhs. W2, W4. Mandate issued on August 3, 2004. Exh. W5.

## II. CURRENT PETITION

On October 15, 2002, Petitioner filed his initial petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. #1) in the Orlando Division of this Court ("Orlando Court"). On October 17, 2002, the Orlando Court granted Petitioner's motion to hold the proceedings in abeyance pending exhaustion of State remedies, and stayed and administratively closed this action pending final resolution of the State court proceedings (Doc. #7). On October

26, 2004, the Orlando Court reopened this action (Doc. #23), and permitted Petitioner to file an amended petition (Doc. #25, Petition).[3] On July 19, 2006, the Orlando Court transferred this action to this Court, noting that, although Petitioner was indicted in Orange County, Florida, the State action was subsequently transferred to the Twentieth Circuit Court, in and for Collier County, Florida (Doc. #37).

The Petition alleges Petitioner's conviction and death sentence are in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. *See generally* Petition. In particular, Petitioner seeks relief on the following enumerated grounds for relief:

> (1) The trial court's refusal to sever counts I and II from the remaining charges violated Gudinas' due process rights to a fair trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution;
>
> (2) Gudinas was involuntarily excluded from certain pretrial hearings, denying his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. Counsel's failure to preserve this issue denied Gudinas his Sixth and Fourteenth Amendment Rights;

---

[3]Respondents do not address whether any of the Grounds raised in the amended petition (Doc. #25) relate back to the original petition (Doc. #1) pursuant to Fed. R. Civ. P. 15(c) to be entitled to the benefit of the earlier filing date. The Court has independently determined that only Ground 18 was not raised in the original petition. For purposes of clarity, all references to "Petition" hereinafter will be Petitioner's amended petition (Doc. #25).

(3)  Gudinas' conviction on Count II of the indictment, attempted sexual battery of Rachelle Smith, violates the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because there is insufficient evidence: no proof of an overt act in furtherance of the attempt;

(4)  The trial court admitted into evidence gruesome photographs rendering Gudinas' trial fundamentally unfair in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendment to the Constitution.  To the extent that the trial counsel failed to litigate and preserve this issue, Gudinas was denied his Sixth and Fourteenth Amendment rights to effective assistance of counsel;

(5)  Improper bolstering of a witness by the introduction of a prior consistent hearsay statement denied Gudinas due process and a fair trial guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments; Counsel's failure to preserve the issue denied Gudinas effective assistance of counsel violating the Sixth and Fourteenth Amendments;

(6)  Irrelevant prejudicial collateral evidence and counsel's failure to preserve the issue denied Gudinas due process, a fair trial, and ineffective assistance of counsel guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

(7)  The State amended the indictment by jury instruction and argument, resulting in a verdict insufficient as a matter of law, denying Gudinas due process, a fair trial, and effective counsel as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

(8)  Trial court restricted presentation of defense evidence, denying Gudinas due process and a trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

(9)  Prosecutorial misconduct in the penalty phase denied Gudinas due process, a fair trial, and effective assistance of counsel guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

(10) The jury recommend [sic] was tainted by improper and inadequate instruction, which denied Gudinas due process, a fair trial, and effective assistance of counsel guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

(11) The court's finding that the murder was especially heinous, atrocious or cruel violates the Eighth and Fourteenth Amendments to the United States Constitution;

(12) The trial court's error in considering mitigation renders the sentence unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution;

(13) Rejection of the statutory mitigator that Gudinas' ability to appreciate the criminality of his conduct or to conform his conduct to the standards of law was substantially impaired renders the death sentence arbitrary and capricious in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

(14) Ineffective assistance of counsel in the penalty phase denied Gudinas due process, a fair trial, and effective assistance of counsel guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

(15) Ineffective assistance of counsel in the guilt phase denied Gudinas due process, a fair trial, and effective assistance of counsel guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

(16) Florida rules barring juror interviews violate equal protection principles, and the First, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

(17) Cumulative error denied Gudinas due process, and a fair trial and appeal, guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

(18) The judgment and sentence must be vacated in light of *Ring v. Arizona*.[4]

Petition (Doc. #26) at 1-65.

### III.   APPLICABLE LAW

Because Petitioner filed his § 2254 Petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Abdul-Kabir v. Quarterman*, 127 S. Ct. 1654, 1664 (2007); *Penry v. Johnson*, 532 U.S. 782, 792 (2001).  The AEDPA "establishes a more deferential standard of review of state habeas judgments," *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001), *cert. denied*, 535 U.S. 1104 (2002), in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).  Several aspects of § 2254, as amended by the AEDPA, are relevant to a review of this Petition.

### A.   Petition Subject to One-Year Limitations Period

AEDPA establishes a one-year federal limitations period for petitions.  In pertinent part, 28 U.S.C. § 2244 provides:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of –
>
>> (A) the date on which the judgment became final by the conclusion of direct review or

---

[4]*Ring v. Arizona*, 536 U.S. 584 (2002).

the expiration of the time for seeking such
review;

(B) the date on which the impediment to filing
an application created by State action in
violation of the Constitution or laws of the
United States is removed, if the applicant was
prevented from filing by such State action;

(C) the date on which the constitutional right
asserted was initially recognized by the
Supreme Court, if the right has been newly
recognized by the Supreme Court and made
retroactively applicable to cases on
collateral review; or

(D) the date on which the factual predicate of
the claim or claims presented could have been
discovered through the exercise of due
diligence.

(2) The time during which a properly filed application
for State post-conviction or other collateral review with
respect to the pertinent judgment or claim is pending
shall not be counted toward any period of limitation
under this subsection.

The one-year limitations period is not jurisdictional, and is
subject to equitable tolling in certain cases. *Holland v. Florida*,
___ U.S. ___, 130 S.Ct. 2549, 2562 (2010). For a petitioner to be
entitled to equitable tolling, he must show that (1) he was
pursuing his rights diligently; and (2) that "extraordinary
circumstances" stood in his way, which prevented his timely filing.
*Id.* at 2562.

## B.  Only Federal Claims Are Cognizable

A federal court may entertain an application for a writ of
habeas corpus, from a person in state custody pursuant to a state
court judgment, only on the grounds that the Petitioner is in

custody in violation of the United States Constitution or the laws or treaties of the United States.  28 U.S.C. § 2254(a).  A claimed violation of state law is generally insufficient to warrant review or relief by a federal court under § 2254.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Cabberiza v. Moore*, 217 F.3d 1329, 1333 (11th Cir. 2000).  Questions of state law are only reviewed to determine whether the alleged errors rendered "the entire trial fundamentally unfair."  *Carrizales v. Wainwright*, 699 F.2d 1053, 1055 (11th Cir. 1983).

## C.  Claim Must Be Exhausted in State Court

A petitioner, even when asserting grounds that warrant review by a federal court under § 2254, must have first raised such grounds before the state courts, thereby giving the state courts the initial opportunity to address the federal issues.  A § 2254 application cannot be granted unless a petitioner "has exhausted the remedies available in the courts of the State; . . ."  28 U.S.C. § 2254(b)(1)(A).  This imposes a "total exhaustion" requirement in which all of the federal issues must have first been presented to the state courts.  *Rhines v. Weber*, 544 U.S. 269, 274 (2005).

"[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  *See also Duncan v. Henry*, 513 U.S. 364, 365-

66 (1995). "A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001). *See also Pruitt v. Jones*, 348 F.3d 1355, 1358-59 (11th Cir. 2003), *cert. denied sub nom. Pruitt v. Hooks*, 543 U.S. 838 (2004). To properly exhaust a claim, a petitioner must present the *same* claim to the state court that he urges the federal court to consider. A mere citation to the federal constitution is insufficient for purposes of exhaustion. *Anderson v. Harless*, 459 U.S. 4, 7 (1983). "'[T]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'" *McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005) (quoting *Kelley v. Sec'y for the Dep't of Corr.*, 377 F.3d 1317, 1343-44 (11th Cir. 2004)).

As to ineffective assistance of counsel claims, Petitioner must have presented each instance of alleged ineffective assistance to the state court in such a manner that a reasonable reader would understand each claim's particular legal basis and specific factual foundation. *Ogle*, 488 F.3d at 1368 (citations omitted); *Kelley*, 377 F.3d at 1344-45. A state prisoner need not file a petition for certiorari with the U.S. Supreme Court, however, in order to exhaust state remedies because the U.S. Supreme Court is not

considered to be a part of a "State's post-conviction procedures."
*Lawrence v. Florida*, 127 S. Ct. 1079, 1083 (2007).

When presented with a "mixed" petition, i.e., one containing
both unexhausted and exhausted claims, a district court is
ordinarily required to either dismiss the petition, *Pliler v. Ford*,
542 U.S. 225, 227 (2004); *Rose v. Lundy*, 455 U.S. 509 (1982), or,
in limited circumstances and under the district court's discretion,
"grant a stay and abeyance to allow the petitioner to exhaust the
unexhausted claim." *Ogle*, 488 F.3d at 1370 (citing *Rhines*, 544
U.S. at 277-79). However, when it is obvious that the unexhausted
claims would be procedurally barred in state court due to a state-
law procedural rule, the Eleventh Circuit has held that a district
court can consider the petition but treat those unexhausted claims
as procedurally defaulted. *Ogle*, 488 F.3d at 1370. Additionally,
while under the AEDPA a federal court may not grant a habeas
petition that contains unexhausted claims, it may deny such a
petition on the merits. *LeCroy v. Sec'y, Fla. Dep't of Corr.*, 421
F.3d 1237, 1261 n.26 (11th Cir. 2005).

"The teeth of the exhaustion requirement comes from its
handmaiden, the procedural default doctrine." *Smith v. Jones*, 256
F.3d 1135, 1138 (11th Cir. 2001), *cert. denied*, 534 U.S. 1136
(2002). Under the procedural default doctrine, "[i]f the
petitioner has failed to exhaust state remedies that are no longer

available, that failure is a procedural default which will bar federal habeas relief, . . . ." *Smith*, 256 F.3d at 1138.

A procedural default for failing to exhaust state court remedies will only be excused in two narrow circumstances. First, a petitioner may obtain federal habeas review of a procedurally defaulted claim if he shows both "cause" for the default and actual "prejudice" resulting from the asserted error. *House v. Bell*, 547 U.S. 518, 536-37 (2006); *Mize v. Hall*, 532 F.3d 1184, 1190 (11th Cir. 2008). "Cause" ordinarily requires a petitioner to demonstrate "that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003) (quoting *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). Constitutionally ineffective assistance of counsel can constitute cause if that claim is not itself procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). To show "prejudice," a petitioner must demonstrate that there is "at least a reasonable probability that the result of the proceeding would have been different." *Henderson*, 353 F.3d at 892.

Second, under exceptional circumstances, a petitioner may obtain federal habeas review of a procedurally defaulted claim, even without a showing of cause and prejudice, if such review is necessary to correct a fundamental miscarriage of justice. *House*, 547 U.S. at 536; *Edwards*, 529 U.S. at 451; *Henderson*, 353 F.3d at

892.  This exception is only available "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent."  *Henderson*, 353 F.3d at 892.  *See also House*, 547 U.S. at 536-37 (prisoner asserting actual innocence must establish that, "in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt") (citation omitted).

## D.  Federal Court Affords Deference to State Court Decision

If Petitioner's claim raises a federal question, was exhausted and is not procedurally barred, and was adjudicated on the merits by the Florida Supreme Court, then this Court must afford a high level of deference to the relevant Florida Supreme Court decision on that claim.  *See, e.g.*, *Ferguson v. Culliver*, 527 F.3d 1144, 1146 (11th Cir. 2008).  Habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  *See Knowles v. Mirzayance*, 556 U.S. ___, 129 S.Ct. 1411, 1412 (2009); *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Price v. Vincent*, 538 U.S. 634, 638-39 (2003).  A state court's summary rejection of a claim, even without explanation, qualifies

as an adjudication on the merits which warrants deference. *Ferguson*, 527 F.3d at 1146.

"Clearly established federal law" consists of the governing legal principles, rather than the *dicta*, set forth in the decisions of the United States Supreme Court at the time the state court issues its decision. *Carey v. Musladin*, 549 U.S. 70, 74 (2006)(citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). In cases where nothing in the Supreme Court's jurisprudence addresses the issue on point or the precedent is ambiguous and gives no clear answer to the question, it cannot be said that the state court's conclusion is contrary to, or constitutes an unreasonable application of, "clearly established Federal law." *Wright v. Van Patten*, 128 S. Ct. 743, 747 (2008); *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003).

A state court decision can be deemed "contrary to" the Supreme Court's clearly established precedents within the meaning of § 2254(d)(1) only if: (1) the state court applies a rule that contradicts the governing law as set forth in Supreme Court cases, or (2) the state court confronts a set of facts that is "materially indistinguishable" from those in a decision of the Supreme Court and yet arrives at a disparate result. *Brown*, 544 U.S. at 141; *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003). Further, it is not mandatory for a state court decision to cite, or even to be aware of, the relevant Supreme Court precedents, "so long as neither the

reasoning nor the result . . . contradicts them." *Early v. Parker*, 537 U.S. 3, 8 (2002); *Mitchell*, 540 U.S. at 16.

A state court decision involves an "unreasonable application" of the Supreme Court's precedents if the state court correctly identifies the governing legal principle but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown*, 544 U.S. at 134; *Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir. 2000), *cert. denied*, 534 U.S. 956 (2001); or, "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Bottoson*, 234 F.3d at 531 (quoting *Williams*, 120 S. Ct. at 1520). The "unreasonable application" inquiry "requires the state court decision to be more than incorrect or erroneous"; it must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75-77 (2003) (citation omitted); *Mitchell*, 540 U.S. at 17-18; *Ward*, 592 F.3d at 1155. Depending upon the legal principle at issue, there can be a range of reasonable applications. *Yarborough v. Alvarado*, 541 U.S. 652, 663-64 (2004). Thus, the state court's decision is not subject to federal review *de novo*; rather, § 2254(d)(1) relief is only available upon a showing that the state court decision meets the "objectively unreasonable" standard. *Id.* at 665-66.

Alternatively, a § 2254 petitioner can obtain relief by showing that a state court decision "was based on an unreasonable

determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2).   Where the credibility of a witness is at issue, relief may only be granted if it was unreasonable, in light of the evidence presented, for the state court to credit the testimony of the witness in question. *Rice v. Collins*, 546 U.S. 333, 338 (2006).   Additionally, a factual finding by a state court is presumed to be correct and a petitioner must rebut this "presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005); *Henderson*, 353 F.3d at 890-91.   This statutory presumption of correctness, however, "applies only to findings of fact made by the state court, not to mixed determinations of law and fact." *Parker v. Head*, 244 F.3d 831, 836 (11th Cir.), *cert. denied*, 534 U.S. 1046 (2001) (citation omitted).   An ineffective assistance of counsel claim is a mixed question of law and fact; therefore, the presumption does not apply and such claims are reviewed *de novo*. *Rolling v. Crosby*, 438 F.3d 1296, 1299 (11th Cir.), *cert. denied sub nom. Rolling v. McDonough*, 126 S. Ct. 2943 (2006).

Finally, if the state court fails or declines to rule on the merits of a particular claim raised before it, that claim falls outside of the scope of § 2254(d)(1)'s restrictions and the reviewing federal habeas court owes no deference to the state court decision when evaluating that claim. *Davis v. Sec'y for the Dep't of Corr.*, 341 F.3d 1310, 1313 (11th Cir. 2003).

**E.   Ineffective Assistance of Trial Counsel/Appellate Counsel**

As more fully discussed *infra*, ineffective assistance of counsel claims are reviewed under the standards established by 28 U.S.C. § 2254(d). *Newland v. Hall*, 527 F.3d 1162, 1183 (11th Cir. 2008). Post-AEDPA, the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), remains applicable to the claims of ineffective assistance of counsel raised in this Petition. *Newland*, 527 F.3d at 1184. In *Strickland*, the Supreme Court established a two-part test to determine whether a convicted person is entitled to habeas relief on the grounds that his or her counsel rendered ineffective assistance: (1) whether counsel's representation was deficient, *i.e.*, "fell below an objective standard of reasonableness" "under prevailing professional norms," which requires a showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (2) whether the deficient performance prejudiced the defendant, *i.e.*, there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 688; *see also Bobby Van Hook*, 558 U.S. ___, 130 S. Ct. 13, 16 (2009). Thus, a habeas court's review of a claim under the *Strickland* standard is "doubley deferential." *Knowles v.*

*Mirzayanze*, ___ U.S. ___, 129 S.Ct.  1411, 1420 (2009)(citing *Yarborough v.  Gentry*, 540 U.S. 1, 5-6 (2003)).

States may "impose whatever specific rules . . . to ensure that criminal defendants are well represented," but "the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Bobby Van Hook*, 130 S.Ct. at 17 (internal quotations and citations omitted).  Petitioner bears the heavy burden to "prove, by a preponderance of the evidence, that counsel's performance was unreasonable." *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006), *cert. denied sub nom. Jones v. Allen*, 127 S. Ct. 619 (2006).  The Court must "judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct," *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (quoting *Strickland*, 466 U.S. at 690), applying a "highly deferential" level of judicial scrutiny. *Id.*  The court must adhere to a strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.  An attorney is not ineffective for failing to raise or preserve a meritless issue. *Ladd v. Jones*, 864 F.2d 108, 109-10 (11th Cir.), *cert. denied sub nom. Ladd v. Burton*, 493 U.S. 842 (1989); *United States v. Winfield*, 960 F.2d 970, 974 (11th Cir. 1992) ("a lawyer's failure to preserve a meritless issue plainly cannot prejudice a client"). "To state the obvious: the trial lawyers, in every case, could have

done something more or something different.   So, omissions are inevitable.   But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000)(quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).

## IV. DISCUSSION

Upon careful review of the record and, for the reasons set forth below, the Court concludes no evidentiary proceedings are required in this Court.   *Schriro v. Landrigan*, 550 U.S. 465, 127 S. Ct. 1933, 1939-40 (2007).   Petitioner does not proffer any evidence that would require an evidentiary hearing, *Chandler v. McDonough*, 471 F.3d 1360 (11th Cir. 2006), and the Court finds that the pertinent facts of the case are fully developed in the record before the Court.   *Schriro*, 127 S. Ct. at 1940; *Turner v. Crosby*, 339 F.3d 1247, 1275 (11th Cir. 2003), *cert. denied*, 541 U.S. 1034 (2004).

## A.   Federal Limitations Period

Respondents submit that the Petition is time-barred.   Response at 18-29.   Specifically, Respondents suggest that the date  that the Florida Supreme Court denied Petitioner's motion for rehearing in connection with his Rule 3.850 motion, as opposed to the date the Florida Supreme Court issued mandate, should be the triggering date for restarting the one-year federal limitations period.   *Id.* The Court disagrees under the particular facts of this case.

On April 10, 1997, the Florida Supreme Court affirmed Gudinas'
convictions and sentence of death.  *See Gudinas v. State*, 693 So.
2d 953 (Fla. 1997); Exh. E.  On October 20, 1997, the United States
Supreme Court denied Gudinas' petition for writ of certiorari.  *See
Gudinas v. Florida*, 522 U.S. 936 (1997); Exh. F-3.  Respondents
correctly recognize that under AEDPA, Petitioner's conviction and
sentence became final on October 20, 1997 for purposes of §
2244(d)(1)(A).

Petitioner permitted 229 days of the federal limitations
period to expire before he filed his first State post-conviction
Rule 3.850 motion on June 5, 1998.  Exh. G.  This motion tolled the
running of the one-year limitation period under AEDPA until the
appeal from the denial of post-conviction relief was final.   28
U.S.C. § 2244(d)(2).  Respondents submit that May 7, 2002, the date
the Florida Supreme Court denied Petitioner's motions for rehearing
on his consolidated State habeas petition and appeal of his Rule
3.850 motion, is the date Petitioner's Rule 3.850 motion was no
longer pending for purposes of AEDPA.  Response at 19.  In support,
Respondents cite to *Felton v. Florida*, 153 Fed. Appx. 620 (11th
Cir. 2001).[5]

The Court finds *Felton* clearly distinguishable from the
instant case.  The *Felton* case involved only a pure State habeas

---

[5] Respondents also cite to Fla. R. App. P. 9.141(c), which does
not apply to death penalty cases.  *See* Fla. R. App. P. 9.141(a).

proceeding.  *Id.* at 621.  Thus, in *Felton*, the Eleventh Circuit determined that the one-year federal limitations period was restarted after the Florida Supreme Court denied petitioner's motion for a rehearing, because there was no lower court to whom the Florida Supreme Court could issue or direct mandate.  *Id.*  In the instant case, Petitioner, pursuant to Florida Rule of Appellate Procedure 9.142(a)(5), filed his State habeas petition simultaneously with the appeal from the denial of his Rule 3.850 motion, which the Florida Supreme Court consolidated into one case. *See Gudinas v. State*, 816 So.2d 1095 (Fla. 2002); Exh. L.  However, "[i]n Florida, a state court of appeals' order denying a rehearing on its affirmance of the state trial court denial of a motion for post-conviction relief is pending until mandate issues." *Nyland v. Moore,* 216 F.3d 1264, 1267 (11th Cir. 2000); *see also Day v. McDonough*, 547 U.S. 198, 203 (2006)(recognizing "under Florida law, appellate order 'is pending' until the mandate issues").  Thus, in the instant case, Petitioner's appeal on his Rule 3.850 motion was pending until the Florida Supreme Court issued mandate on June 6, 2002.  Exh. L-5.

On October 15, 2002, 131 days after the Florida Supreme Court issued mandate on Petitioner's appeal of the denial of his Rule 3.850 motion, Gudinas initiated the instant action by filing the original petition in the Orlando Court.  See Doc. #1.  Thus, only 360 days of the federal limitations period elapsed before

Petitioner filed the instant action.  Consequently, the Court will address the merits of the Petition, finding that the federal petition was timely filed within the one-year limitations period under AEDPA.

## B.  Grounds Discussion

Issues related to Petitioner's guilt were decided in Petitioner's jury trial held May 1-4, 1995 (Exhs. A14-A18), Petitioner's penalty-phase jury trial was conducted on May 8-10, 1995 (Exhs. A19-20); and the operative sentencing order was entered by Judge Perry on June 16, 1995 (Exh. A10).   Petitioner's conviction of guilt and sentence of death were affirmed by the Florida Supreme Court in *Gudinas v. State*, 693 So. 2d 953 (Fla. 1997); Exh. E.  The postconviction court's denial of Petitioner's Rule 3.850 motion was affirmed by the Florida Supreme Court in *Gudinas v. State*, 816 So. 2d 1095 (Fla. 2002); Exh. L.

### Ground 1
**The trial court's refusal to sever counts I and II from the remaining charges violated Petitioner's due process rights to a fair trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.** [Petition at 2, Memorandum at 1-3].

Petitioner argues that the trial court's refusal to sever counts I and II, the crimes against Rachelle Smith, from the remaining counts, the crimes against Michelle McGrath, violated Petitioner's right to a fair trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  Amended Petition at 3.  In support, Petitioner argues that the joinder of these counts prejudiced

Petitioner and "confounded Thomas Gudinas' defense."  Memorandum
(Doc. #26) at 3.  Petitioner argues that the Florida Supreme Court
in denying this issue failed to "correctly identify and articulate
the legal principles or apply them to this case."  *Id.*

### (a) Exhaustion and Procedural Default:

Respondents argue that Gudinas raised the issue of severance
on direct appeal in terms of State law grounds, and the Florida
Supreme Court decided it on that basis.  Response (Doc. #31) at 52.
In the alternative, Respondents contend that Petitioner has failed
to satisfy his burden under AEDPA because he has not shown that the
Florida Supreme Court decision was contrary to, or an unreasonable
application of, clearly established federal law, or established
that the State court's ruling was an unreasonable determination of
the facts in light of the evidence presented.  *Id.*  at 53.

As set forth earlier, Petitioner must have "fairly presented"
the "substance" of his federal claims to the state court*. Anderson
v. Harless*, 459 U.S. 4, 6 (1982).  This can be done "by citing in
conjunction with the [state] claim the federal source of law on
which he relies or a case deciding such a claim on federal grounds,
or by simply labeling the claim 'federal.'" *Baldwin v. Reese*, 541
U.S. 27, 32 (2004).  The fact that the Florida Supreme Court does
not specifically discuss a federal constitutional claim in its
opinion on a particular claim, "does not mean the claim was not
presented to it." *Dye v. Hofbauer*, 546 U.S. 1, 3 (2005).

Under the caption "Argument" in Petitioner's "Initial Brief of Appellant" on direct appeal to the Florida Supreme Court, Petitioner states that "[e]ach issue is predicated on the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, Article I, Sections 9, 16, 17, and 22 of the Florida Constitution, and such other authority as is set forth." Exh. B. at 27 ("direct appeal brief"). In "Point I" of his direct appeal brief, Petitioner frames this issue as one of trial court error: "the trial court erred in denying appellant's motion to sever count I and II from the remaining charges." *Id.* None of the cases cited in the eight pages of Petitioner's direct appeal brief on the severance issue discuss or mention the United States Constitution, or even the Florida Constitution. Instead, Petitioner argues the issue of trial court error only in terms of Florida Rule of Criminal Procedure 3.150(a).

Simply referring to a litany of Constitutional rights in an introductory paragraph does not sufficiently present the substance of the federal dimension of a claim to the State court any more than a passing reference to the generic phrase "ineffective assistance of . . . counsel" raises a Sixth Amendment claim. *See Baldwin v. Reese*, 541 U.S. 27, 32-33 (2004). Indeed, it is unclear which of the four catch-all Constitutional amendments are implicated by each of the enumerated eighteen claims. To the extent that Petitioner contends that this general reference to

various    Constitutional  Amendments  is  sufficient  for  federal
purposes to exhaust each of his direct appeal claims, Petitioner is
incorrect.   The  Court  finds  such  a  general  isolated  reference
wholly  insufficient  and  exactly  the  type  of  "needle  in  the
haystack"  that  the  Eleventh  Circuit  has  previously  rejected  as
satisfying  the  exhaustion  requirement.   *See Kelley,* 377 F.3d at
1344-50.   Consequently,  the  Court  finds  that  the  federal  dimension
of Ground 1 was not fairly presented to the Florida Supreme Court,
and  that  Petitioner  has  not  shown  cause  and  prejudice  or  a
fundamental miscarriage of justice, which would excuse his lack of
presentation  of  this  Ground.   Therefore,  the  Court  finds  that
Ground 1 is procedurally defaulted.

**(b) Alternative Merits Determination:**

Assuming *arguendo* that Petitioner's incorporation paragraph
was sufficient to present a federal issue to the Florida Supreme
Court, the Court will determine the merits of Petitioner's claim in
the alternative.   The Florida Supreme Court rejected Petitioner's
claim that the trial court abused its discretion in consolidating
all  five  counts  in  the  information  into  one  trial.   *Gudinas v.
State*, 693 So.2d 953 at 961.   After reviewing applicable Florida
case  law,  the  Florida  Supreme  Court  found  that  Florida  Rule  of
Criminal Procedure 3.150(a), which permits joinder of "two or more
connected acts or transactions," requires:

> First,  for  joinder  to  be  appropriate  the  crimes  in
> question must be linked in some significant way.   This

can include the fact that they occurred during a "spree" interrupted by no significant period of respite, *Bundy,*[6] or the fact that one crime is causally related to the other, even though there may have been a significant lapse of time. *Fotopoulos.*[7] But the mere fact of a general temporal and geographic proximity is not sufficient in itself to justify joinder except to the extent that it helps prove a proper and significant link between the crimes. *Crossley.*[8]

*Gudinas v. State*, 693 So. 2d at 960. The court found the following

facts in the record supportive of the trial court's order denying

severance:

Gudinas made three separate, unsuccessful attempts to break into Rachelle Smith's car after following her from the other parking lot. His intention to sexually assault her was made clear by the vulgar language he shouted at her as he attempted to smash his way through the driver's side window. His actions indicate he was willing to forcibly enter Rachelle Smith's car. He did not have to yell, "I want to rape you," in order for his criminal intentions to be apparent.

Unsuccessful in his attempt to rape Smith, the record [FN 9] reflects that within no more than three hours and in the same proximate area, Gudinas brutally raped and murdered Michelle McGrath. Gudinas' failure to complete his attack against Rachelle Smith may have provided a causal link to his completed attack on Michelle McGrath, thus allowing joinder under *Fotopoulos.* Furthermore, the State makes a persuasive argument that the attacks were separated by less than one hour. Under the State's scenario or even if approximately three hours elapsed, Gudinas' offenses constitute a crime spree as

---

[6]*Bundy v. State*, 455 So. 2d 330 (Fla. 1984), *cert denied*, 476 U.S. 1109 (1986).

[7]*Fotopoulos v. State*, 608 So. 2d 784 (Fla. 1992), *cert denied*, 508 U.S. 924 (1993).

[8]*Crossley v. State*, 596 So. 2d 447 (Fla. 1992).

contemplated in *Bundy.* The attempted rape and accompanying violence of his aborted entry into Rachelle Smith's car, and the actual rape and extreme violence of his murder of Michelle McGrath demonstrate a "meaningful relationship" between the two attacks as required by Crossley.

> [FN 9] Gudinas is correct that the State's case is based on circumstantial evidence. However, even he admits that all the evidence points to him as the killer.

*Id.* at 960. Alternatively, even if severance was required, the Florida Supreme Court determined that "any error [was] harmless beyond a reasonable doubt." *Id.* (citations omitted). In particular, the court noted that "Rachelle Smith's testimony still would have been admissible in a severed trial for the McGrath attack as similar fact evidence in establishing Gudinas' motive for raping and murdering Michelle McGrath." *Id.* at 960-61 (citations omitted).

Notably, the Florida Supreme Court did not specifically discuss this ground in terms of a federal constitutional claim, and, in fact, in denying Petitioner relief expressly stated that their decision was based on "the facts of this case and **our prior case law.**" *Id.* at 961 (emphasis added). Nonetheless, to the extent that Petitioner's direct appeal brief is deemed to be sufficient to fairly present this issue, then the Florida Supreme Court's decision would be deemed sufficient to constitute an adjudication on the merits of the issue, denying this ground.

*Ferguson v. Culliver*, 527 F.3d at 1146 (giving deference to summary rejection of a claim even without explanation).

The Court finds that the Florida Supreme Court's denial of the federal constitutional claim was not contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court or an unreasonable determination of the facts in light of the evidence presented.  In his Reply, Petitioner cites to the Supreme Court's holding in *McElroy v. United States*, 164 U.S. 76, 79-80 (1896) as "fundamental Supreme Court precedent." Reply at 3.  *McElroy* is not controlling.  *McElroy* involved multiple defendants being tried in a joint trial, and held that misjoinder is inherently prejudicial and requires automatic reversal.  *Id.* The Supreme Court subsequently rejected *McElroy* to the extent that it stands for the proposition that misjoinder of claims "is inherently prejudicial" and requires "automatic reversal," noting that the case was decided "long before" the adoption of Federal Rules of Criminal Procedure 8 and 52, and the enactment of the harmless-error statute, 28 U.S.C. § 2111." *United State v. Lane*, 474 U.S. 438, 444 (1986).  The *Lane* Court noted that "improper joinder does not, in itself, violate the Constitution.  Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *Id*. at 446, n.8.  In rejecting the *per se* rule, the Court held that "an error  involving

misjoinder 'affects the substantial rights' and requires reversal only if the misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'"  *Id.* at 449.

Here, the Court finds the Florida Supreme Court's finding that, even if severance was required, such error was harmless is in accord with the Court's holding in *Lane*.  Significantly, the *Lane* Court recognized that the evidence in the objectionable count, count 1, would have been admissible on a joint retrial of counts 2 through 6, under Federal Rule of Evidence 404(b).[9]  *Id*. at 450. Thus, the Court held that "[a]ny error therefore failed to have any substantial influence on the verdict." *Id*. at 450 (internal quotations and citations omitted).  Accordingly, Ground 1 is dismissed as procedurally defaulted, or alternatively, is denied on the merits.

### Ground 2

**(a) Gudinas was involuntarily excluded from certain pretrial hearings, denying his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.  (b) Counsel's failure to preserve this issue denied Gudinas his Sixth and Fourteenth Amendment Rights.** [Petition at 3, Memorandum at 3-5].

Petitioner argues that he was involuntarily excluded from certain pretrial hearings, denying his rights under the Fifth,

---

[9]Evidence or other crimes, wrongs or acts is admissible of "motive, opportunity . . . ." Fed. R. Evid. 404(b).

Sixth, Eighth, and Fourteenth Amendments and that counsel's failure to preserve the issue denied his Sixth and Fourteenth Amendment rights to effective counsel.   Petition at 4.   In particular, Petitioner states that he was absent from a November 4, 1994 hearing on defense counsel Mr. Irwin's motion to withdraw; an August 23, 1994 hearing on the State's motion for exemplars; and, a September 1, 1994 hearing on the appointment of an investigator and motion for mental health assessment.   *Id.*   Petitioner argues that the hearings "involved more than merely legal matters," and claims that Petitioner had a "constitutional right to be present where fundamental fairness might be thwarted by his absence." Memorandum at 4-5.   Petitioner, acknowledging that the Florida Supreme Court held that the "issue was procedurally barred because counsel did not contemporaneously object" also, raises a claim that "effective counsel would have contemporaneously objected."   *Id.* at 5.   Thus, although raised together as Ground 2, the Court will address each of these claims separately.

### (a) Exhaustion and Procedural Default-Claims 2(a) and 2(b):

Respondents argue, without distinction to claim 2(a) or 2(b), that although this Ground was raised on direct appeal, it was raised on State law grounds only, and is therefore procedurally defaulted.   Response at 53-54.   Additionally, Respondents argue that the Court should accord and enforce the Florida Supreme Court's denial of relief on Petitioner's Ground 2(a), finding the

claim procedurally barred because defense counsel did not raise a contemporaneous objection and preserve the ground for appellate review. *Id.* at 56. Thus, resulting in Petitioner's current ineffective claim as to this issue, Ground 2(b). In the alternative, Respondents argue that Petitioner has not shown that the Florida Supreme Court's decision on this ground was contrary to, or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented. *Id.*

Petitioner in his direct appeal brief to the Florida Supreme Court framed this claim as follows: "The trial court erred in conducting several pretrial hearings where the appellant was involuntarily excluded thus denying Gudinas' rights to due process under the Sixth and Fourteenth Amendment to the United States Constitution and the Florida Constitution." Exh. B at 35. Although Petitioner cited to no federal cases, Petitioner argued that his absence at the pretrial hearings violated the "Florida Rules of Criminal Procedure as well as his constitutional right to be present at all stages of his trial where fundamental fairness might be thwarted by his absence." *Id.* at 39. Consequently, the Court finds that Petitioner did alert the State court to the federal dimension of Ground 2(a) on direct appeal.

Petitioner raised his ineffective assistance of counsel claim, Ground 2(b), as "Claim VI" in his Rule 3.850 motion. Exh. G-3 at

38.   In particular, Petitioner claimed that trial counsel was ineffective in failing "to object to off-the-record discussions" and Gudinas' exclusion from the discussions in violation of Gudinas' Sixth, Eighth and Fourteenth Amendment rights.   *Id*. Petitioner identified the in-chambers discussion on defense counsel's motion to withdraw and trial counsel's motion to appoint a mental health expert as the "off the record discussions" from which Gudinas was excluded.   *Id*. at 38-39.   Petitioner did not allege ineffectiveness in connection with Gudinas' absence from the State's motion for exemplars.   *Id*.   The postconviction trial court denied the claim concerning Petitioner's absence from the in-chambers hearing on the grounds that Petitioner could not establish the prejudice prong of *Strickland* based upon the Florida Supreme Court's finding that "Gudinas' absence did not frustrate the fairness of the proceeding and his presence would not have assisted the defense in any way." Exh. G-4 at 22.   The postconviction court denied Petitioner's ineffectiveness claim concerning defense counsel's motion to hire an expert on the grounds that Gudinas had not demonstrated at the evidentiary hearing what testimony Dr. Seigel could have provided that the other expert, Dr. Lippman, did not.   Since the trial court had determined that Dr. Lippman's testimony would not have altered the outcome of the penalty phase recommendation or sentencing, the State court found that Gudinas

failed to present any evidence to demonstrate prejudice by his absence on the motion to hire Dr. Seigel. *Id.*

Petitioner did not, however, raise Claim VI in his appeal of the denial of his Rule 3.850 motion. *See generally* Petitioner's Initial Brief of Appellant submitted to the Florida Supreme Court (case no. SC00954), Exh. I. Thus, Petitioner did not fully exhaust his claim that defense counsel was ineffective for failing to object to Gudinas' absence from certain pretrial hearings. Consequently, because Ground 2(b) was not exhausted and Petitioner has not shown cause and prejudice or a fundamental miscarriage of justice, which would excuse such lack of presentation, the Court finds that Ground 2(b) is procedurally defaulted.

**b. Merits Determination- Claim 2(a):**

There is no dispute that defense counsel failed to raise a contemporaneous objection to Petitioner's exclusion from: the in-chambers discussion between the attorneys and the trial judge; the hearing on the motion for exemplars; or, motion on the appointment of an investigator. Thus, counsel did not preserve these claims for appellate review. Consequently, the Florida Supreme Court found that under State law the issue was procedurally barred. *Gudinas v. State*, 693 So. 2d at 961; Exh. E. Nonetheless, the Florida Supreme Court interpreted the claim as raising "fundamental error" and addressed the claim on the merits. *Id.* at 962. In not finding fundamental error, the Florida Supreme Court held:

Our review of the record reveals that the trial judge
went to great lengths, first, to determine what Gudinas'
specific complaint about defense counsel was and, second,
to inform him that he could always bring any concerns to
Mr. LeBlanc, co-counsel, or write directly to the court
itself.  The judge informed Gudinas that unless defense
counsel was acting incompetently, the court did not have
to remove him as appointed counsel.  The judge made no
rulings during the in-chambers discussion where he and
the attorneys discussed the "practicalities of
proceeding."  He had allowed Gudinas to fully air his
concerns before the in-chambers discussion, and he did so
again after the discussion.  He did not rule on the
motion until later that day after the hearing was
concluded.  Although Gudinas never specifically claimed
that defense counsel was acting in a legally incompetent
manner, the trial judge still conducted the inquiry
properly and in accord with the procedure this Court
approved [FN 11] in *Hardwick v. State,* 521 So.2d 1071,
1074-75 (Fla.) (approving *Nelson v. State,* 274 So.2d 256,
258-59 (Fla. 4th DCA 1973)), *cert. denied,* 488 U.S. 871,
109 S.Ct. 185, 102 L.Ed.2d 154 (1988).[FN 12]

> [FN 11] The approved procedure is:
>
> If incompetency of counsel is assigned by the
> defendant as the reason, or a reason, the
> trial judge should make a sufficient inquiry
> of the defendant and his appointed counsel to
> determine whether or not there is reasonable
> cause to believe that the court appointed
> counsel is not rendering effective assistance
> to the defendant.  If reasonable cause for
> such belief appears, the court should make a
> finding to that effect on the record and
> appoint a substitute attorney who should be
> allowed adequate time to prepare the defense.
> If no reasonable basis appears for a finding
> of ineffective representation, the trial court
> should so state on the record and advise the
> defendant that if he discharges his original
> counsel the State may not thereafter be
> required to appoint a substitute.

*Nelson v. State*, 274 So.2d 256, 258-59 (Fla. 4th DCA
1973).

> [FN 12] As we recently noted, a *Nelson* inquiry
> is not warranted where, as here, the record
> indicates that Gudinas' claim was essentially
> a general complaint about defense counsel's
> trial strategy and no formal allegation of
> incompetence was made. *Branch v. State,* 685
> So.2d 1250 (Fla.1996).

*Gudinas v. State*, 693 So. 2d at 961-62.   Further the court found

that "neither the record nor the trial's eventual outcome supports

the conclusion that Gudinas was deprived of his constitutional

right to a fair trial."   The court found persuasive the fact that

"[a]fter the trial court denied defense counsel's motion to

withdraw, the issue never came up again."   *Id.* at 962. (citing

*Garcia v. State*, 492 So.2d 360 (Fla. 1986)).

The United States Supreme Court has held that "a defendant is

guaranteed the right to be present at any stage of the criminal

proceeding that is critical to its outcome if his presence would

contribute to the fairness of the procedure." *Kentucky v. Stincer*,

482 U.S. 730, 745 (1987).   A defendant is not required to be

present at those stages of the trial "when presence would be

useless, or the benefit but a shadow."   *Id.* (internal quotations

and citations omitted).

Based upon the record it is clear that the trial court

undertook a thorough inquiry regarding Gudinas' dissatisfaction

with one of his defense counsel, Mr. Irwin.[10]   *See generally*,

---

[10]Gudinas was appointed two defense counsel, Mr. Irwin and Mr.

(continued...)

Transcript of November 10, 1994 Hearing, Exh. A4. It appears that defense counsel Mr. Irwin and Petitioner did not agree on a mental health defense strategy. *Id*. Petitioner conceded that he was not challenging the competency of Mr. Irwin, but did not "see eye to eye" with Mr. Irwin. *Id*. at 46-47. The court reserved ruling on the matter and took a recess. *Id*. at 51. When the hearing reconvened forty minutes later, the court told Gudinas that "[t]he court had some conversations with the attorneys, your two attorneys, as well as the State, in chambers discussing some of the practicalities of proceeding." *Id*. at 52. The court emphasized at this point that it had not reached a decision on the issue of counsel withdrawing, but encouraged Gudinas to contact the court in writing if he had any additional concerns about counsel. *Id*. at 53-54.

At the same hearing, Gudinas complained about the manner in which the State took DNA examplars from him. *Id*. at 55-58. The court confirmed that it had issued an order and advised Gudinas that "[t]he order I signed is required by law for the court to grant if requested by the State and a showing is made by the State that it is appropriate for the facts surrounding the case that they are prosecuting." *Id*. at 55-56.

---

[10](...continued)
LeBlanc.  Mr. Irwin was lead defense counsel.

There is no evidence that any of the hearings involved anything other than procedural or pure legal matters. Petitioner has not demonstrated how his presence at the hearings would have contributed to the fairness of the proceedings. Thus, Petitioner has failed to demonstrate the presence of a constitutional deprivation. *Stincer*, 482 U.S. at 747; *see also Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)(applying "substantial and injurious effect" standard in habeas claim of constitutional violation). Accordingly, as to Ground 2(a), the Court finds that the Florida Supreme Court decision was not contrary to, or an unreasonable application of federal constitutional law, nor was it an unreasonable application of the facts in light of the evidence presented.

**Ground 3**
**Gudinas' conviction on Count II of the indictment, attempted sexual battery of Rachelle Smith, violates the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because there is insufficient evidence: no proof of an overt act in furtherance of the attempt.** [Petition at 4, Memorandum at 5-9].

Count II charged Petitioner with attempted sexual battery of Rachelle Smith. Petitioner argues that the Florida Supreme Court's decision affirming Petitioner's conviction on Count II, "violates the Fourteenth Amendment because there was insufficient evidence to support the conviction." Memorandum at 6. In particular, Petitioner argues that the "State utterly failed to prove, under Florida law, an overt act that showed that Tommy Gudinas intended

to commit a sexual battery on the victim." *Id.* Petitioner cites to *Jackson v. Virginia*, 443 U.S. 307, 309 (1979) in support of his Fourteenth Amendment claim. *Id.*

Respondents acknowledge that Petitioner raised an insufficiency of the evidence claim as regards to the trial court's denial of Gudinas' motion for acquittal as to Court II on direct appeal. Response at 56. Respondents submit that the Petitioner has failed to meet his burden by showing that the decision by the Florida Supreme Court is contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented. *Id.* at 58.

In denying Petitioner relief on this claim, the Florida Supreme Court held as follows:

> A motion for judgment of acquittal should not be granted unless "there is no view of the evidence which the jury might take favorable to the opposite party that can be sustained under the law." *Taylor v. State,* 583 So. 2d 323, 328 (Fla. 1991). In *Rogers v. State,* 660 So. 2d 237 (Fla. 1995), the defendant pulled a gun while riding in a car with a man and a woman. The defendant ordered the woman to take off her clothes but she refused. *Id.* at 240. He then asked the man to make the woman take off her clothes but he said he could not do that. After the defendant squeezed her left breast, the woman asked him to stop, which he did. The defendant made no further attempts to touch the woman. *Id.* at 241.
>
> Considering these facts, we reversed Rogers' attempted sexual battery conviction, reasoning that while he "may have touched [the woman's] breast and ordered her to remove her clothes, these acts do not rise to the level of an overt act toward the commission of a sexual battery. In addition, once [the woman] refused Rogers'

advances and orders, Rogers left her alone." *Id.* at 241. We then noted that to establish attempt, "the State must prove a specific intent to commit a particular crime and an overt act toward the commission of that crime." *Id.* We found that the State failed to meet its burden. *Id.*

Unlike *Rogers,* the State met its burden in this case by presenting undisputed eyewitness testimony that the defendant followed Rachelle Smith and then tried to forcibly enter her car on three separate occasions, including an attempt to smash her window while screaming, "I want to f___ you." Gudinas only ceased his attempt to gain entry to the car when Rachelle Smith "laid on the horn," creating a loud noise. In contrast, Rogers ceased his advances after simply being asked to stop, although he held the two people at gunpoint with both powerless to stop him.

The crux of Gudinas' argument is that he was "stating his desire, albeit in a socially unacceptable manner, to engage in perfectly legal, consensual sexual intercourse." His argument strains credulity considering he followed Rachelle Smith from the adjacent parking lot, attempted to open the passenger side door and then the driver's side door while she was inside the car, and then attempted to smash the driver's side window while yelling, "I want to f___ you." That line of argument infers that Gudinas would have ceased and desisted if Rachelle Smith refused his advances after he presumably gained access to her car. He contends that the "evidence does not reveal an overt act to support the charge of attempted sexual battery." While Gudinas correctly states that the evidence of his intent is circumstantial, he argues that the evidence fails to exclude the reasonable hypothesis that he was merely soliciting Rachelle Smith for a consensual sex act. However, any support for that hypothesis was dispelled by Rachelle Smith's unequivocal rejection of Gudinas' advances toward her. Gudinas' argument is wholly without merit.

Therefore, for the reasons stated, we find no error in the trial court's denial of Gudinas' motion for judgment of acquittal for the attempted sexual battery of Rachelle Smith.

*Gudinas*, 693 So. 2d at 963; Exh. E.

The United States Supreme Court has held that, in an appeal that challenges the sufficiency of the evidence, the "critical inquiry" is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 403 U.S. at 318-19.   The Supreme Court noted that it is the duty of the trier of fact "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts," and a reviewing court may not substitute its judgment as to whether it believes the evidence to be sufficient to sustain a conviction. *Id.*   In weighing the sufficiency of the evidence, it is not required that the evidence rule out every hypothesis except that of guilt beyond a reasonable doubt.   *Id.* at 326; *Martin v. State of Alabama,* 730 F.2d 721, 724 (11th Cir. 1984).   Further, "the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." *U.S. v. Starrett*, 55 F.3d 1525, 1541 (11th Cir. 1995).   The standard for weighing the constitutional sufficiency of the evidence is a limited one. *Wilcox v. Ford*, 813 F.2d 1140, 1143 (11th Cir. 1987).   When faced with a record of historical facts that supports conflicting inferences, the Court is required to resolve the conflicts in favor of the prosecution and defer to the jury's weight and credibility

of the evidence.  *Jackson v. Virginia*, 443 U.S. at 326; *Wilcox*, 813 F.2d at 1143.

Consistent with Florida law, Fla. Stat. § 794.011(5) and § 777.04(1), the jury was instructed that before they could find Gudinas guilty of the attempted sexual battery of Ms. Smith the State was required to prove that Gudinas "did some act toward committing the crime sexual battery upon or with Rachelle Smith that went beyond just thinking about it." Jury Instructions, Exh. A12 at 518.  Further, the jury was advised that "[i]t is not an attempt to commit Sexual Battery if the defendant abandoned his attempt to commit the offense or otherwise prevented its commission, under circumstances indicating a complete and voluntary renunciation of his criminal purpose." *Id*.  As summarized by the Florida Supreme Court, the victim, Rachelle Smith positively identified Gudinas as her would-be attacker.  Gudinas had followed Ms. Smith from the first parking lot to the second parking lot, where her car was parked.  After Ms. Smith entered her vehicle, Gudinas attempted to gain entry into the locked vehicle, not just once, but on three separate occasions.  During one of these occasions he attempted to smash her window out while screaming, "I want to f___ you."  Gudinas only ceased his effort to gain entry into Smith's vehicle when she "laid on the horn," and created a loud noise.

Based upon the specific facts of the instant case, and construing the facts in the light most favorable to the State, the Court rejects Petitioner's claim that no rational finder of fact could have found him guilty beyond a reasonable doubt of Count II of the Indictment of the attempted sexual battery of Rachelle Smith.   Consequently, the Court finds that the Florida Supreme Court decision was not contrary to, or an unreasonable application of federal constitutional law, nor was it an unreasonable application of the facts and denies Petitioner relief on Ground 3.

> **Ground 4**
> **The trial court admitted into evidence gruesome photographs rendering Gudinas' trial fundamentally unfair in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendment to the Constitution.   To the extent that the trial counsel failed to litigate and preserve this issue, Gudinas was denied his Sixth and Fourteenth Amendment rights to effective assistance of counsel.** [Petition at 5, Memorandum at 9-10].

Petitioner argues that the "extensive presentation of the prejudicial slides violated [Petitioner's] Due Process and Sixth Amendment rights to a fair trial." Memorandum at 9.  Petitioner objects that the slides were shown to the jury during both the guilt and penalty phases.  *Id*. Petitioner, noting that the Florida Supreme Court found that the trial court did not abuse its discretion by admitting the slides due to their relevancy in both the guilt and penalty phases, argues that "[n]either [the trial nor the appellate] court made a Constitutional due process analysis,

thus the adjudication 'resulted in a decision that was contrary to' clearly established federal law." *Id.* at 10.

### (a) Exhaustion and Procedural Default-Claims 2(a) and 2(b):

Respondents argue that the federal claim contained in this Ground was never fairly presented to the State courts. Response at 59. In the alternative, Respondents argue that the decision of the Florida Supreme Court is not contrary to, or an unreasonable application of, clearly established federal law and that Gudinas has not established that the State court's ruling is an unreasonable determination of the facts in light of the evidence presented. *Id.* at 60. Respondents also argue that there "cannot be a due process violation when the photographs accurately reflect the crime scene." *Id.*

Upon review of the record, the Court agrees that this claim is procedurally defaulted. Although Petitioner raised the issue that the trial court erred in admitting the photographs of the victim, and the Florida Supreme Court denied the issue on the merits, Gudinas did not raise the federal dimension of this claim, cite to any federal cases, or assert any Constitutional violation in his direct appeal to the Florida Supreme Court. Instead, Petitioner argues only that the photographic slides were "prejudicial" and cited to Florida cases and Florida Statute, § 90.403 in support of his argument that the trial court improperly: denied defense's motion *in limine* regarding the photographs; denied defense's

renewed objections at trial regarding the photographs; and denied defense's motion for mistrial regarding the photographs. *See generally* Exh. B at 50-52.   Thus, Petitioner's criticism of the Florida court's failure to address a due process claim regarding the photographic slides is unfounded, because Petitioner did not alert the State court to the federal dimension of this ground. Petitioner has not shown cause and prejudice or a fundamental miscarriage of justice, which would excuse such lack of presentation.   Therefore, the Court finds that Ground 4 is procedurally defaulted.

### (b) Alternative Merits Determination:

Moreover, no error has been shown in the State court's rejection of this ground.   The Florida Supreme Court found that there was no abuse of discretion in admitting the gruesome photographs into evidence and that they were necessary during the medical examiner's testimony to show the location and extent of the wounds on Michelle McGrath.   *Gudinas*, 693 So.2d at 963; Exh. E. The court also found that the photographs were "relevant to proving the heinous, atrocious, or cruel aggravating circumstance" during the penalty phase.   *Id.*

State evidentiary rulings are reviewed in a habeas action only to determine "whether the error, if any, was of such magnitude as to deny petitioner his right to a fair trial." *Futch v. Dugger*, 874 F. 2d 1483, 1487 (11th Cir. 1989)(internal quotations and citations

omitted).   "The introduction of graphic photographic evidence rarely renders a proceeding fundamentally unfair." *Jacobs v. Singletary*, 952 F. 2d 1282, 1296 (11th Cir. 1992)(citations omitted).  Here the photographs were used by the medical examiner to explain the extensive wounds to the victim and to demonstrate the heinous, atrocious, or cruel aggravating circumstance of the murder.  Consequently, in the alternative, the Court denies Ground 4 as without merit because the Florida Supreme Court's denial of this claim was not contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court or an unreasonable determination of the facts in light of the evidence presented.

**Ground 5**
**Improper bolstering of a witness by the introduction of a prior consistent hearsay statement denied Gudinas due process and a fair trial guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments; Counsel's failure to preserve the issue denied Gudinas effective assistance of counsel violating the Sixth and Fourteenth Amendments.**
[Petition at 6, Memorandum at 10-11].

Petitioner argues that Fred Harris' taped statement that was introduced into evidence was hearsay because it was not subject to cross-examination; and, thus, was "improper and had the prejudicial effect of placing before the jury substantive evidence which was otherwise inadmissible." Memorandum at 11.  Petitioner challenges the State court's ruling on the basis that the court did not determine "whether the tape violated Tommy Gudinas' rights under

the Confrontation Clause as required by *Ohio v. Roberts*,"[11] and thus "'resulted in a decision that was contrary to' clearly established federal law." *Id.*

Respondents argue that the Florida Supreme Court decided this issue on state law grounds. Response at 61. In the alternative, Respondents submit that the Florida Supreme Court's decision "is neither contrary to, nor an unreasonable application of, clearly established federal law, and there is no basis for relief, assuming that Gudinas' passing reference to the federal Constitution is sufficient to fairly present the federal claim in the first place." Response at 62. Respondents further argue that Gudinas has not established that the State Court's ruling is an unreasonable determination of the facts in light of the evidence presented. *Id.*

Petitioner raised this issue as "Point VI" in his direct appeal brief. Exh. B at 53. Petitioner essentially raised this issue as an issue under Florida State law. *Id.* at 53-54. In concluding his argument, Petitioner nakedly states, "The introduction of the testimony violates Gudinas' constitutional rights to confront witnesses in contravention of the state and federal [C]onstitutions." *Id.* at 54. To the extent that this lone, vague reference to the federal Constitution was sufficient to present a federal issue to the Florida Supreme Court, the Court will determine the merits of Petitioner's claim.

---

[11] *Ohio v. Roberts*, 448 U.S. 56 (1980).

At the time of Gudinas' trial, the governing Supreme Court law provided that the Confrontation Clause precludes the admission of hearsay statements from an unavailable witness unless the statements fall within a firmly rooted hearsay exception or contain a particularized guarantee of trustworthiness. *Ohio v. Roberts,* 448 U.S. 56, 66 (1980).[12]

The Florida Supreme Court rejected Petitioner's claim as follows:

> Gudinas claims that the State improperly introduced a prior consistent statement during its direct and redirect examination of Fred Harris, which evidence was inadmissible hearsay.  After the State refreshed his memory, [FN 14] Fred Harris testified that he witnessed a conversation between his brother Dwayne and Gudinas. He stated that after Gudinas was jokingly accused of murdering Michelle McGrath, Gudinas replied, "Yes, and I f___ed her while she was dead."  After Harris denied that Gudinas sounded serious, the State again refreshed Harris's memory, after which he admitted telling the police in June 1994 that Gudinas "actually sounded serious."  However, on cross-examination, Harris again denied that Gudinas sounded serious when he made the statement.  He did so again on redirect examination at which time the State introduced the taped statement into evidence.
>
>> [FN 14]  Fred Harris had given a taped statement to the police several weeks after the murder.

---

[12]Since *Ohio v. Roberts,* the Supreme Court has held that the Confrontation Clause forbids "testimonial" statements unless the defendant has the opportunity to cross-examine the declarant.  A statement is testimonial if it was "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  *Crawford v. Washington,* 541 U.S. 36, 52 (2004) (quotation omitted).

We agree that the statement was properly used for
impeachment purposes only and was not inadmissible
hearsay. Contrary to Gudinas' argument that the
prosecutor improperly bolstered Harris's testimony with
the introduction of the taped statement, the taped
statement was plainly inconsistent with Harris's
testimony at trial and constituted a prior inconsistent
statement properly introduced for impeachment purposes
only. *State v. Smith,* 573 So.2d 306 (Fla.1990); § 90.608,
Fla.Stat. (1993).  We also agree with the State that the
foundational requirements of section 90.614(2), Florida
Statutes (1993), were fully satisfied where Harris had
the "opportunity to explain or deny the prior statement."
As Professor Ehrhardt has explained, "[t]he prior
statement is admissible to impeach only if it is in fact
inconsistent; i.e., it directly contradicts the in-court
testimony or there is a material variance between the two
statements."  Charles W. Ehrhardt, *Florida Evidence,* §
614.1, at 482 (1995 ed.).  Considering the material
inconsistencies in Harris's description of Gudinas'
demeanor, we find that the State properly impeached its
own witness. *See* § 90.608(1), Fla.Stat. (1993).
Therefore, the trial court did not err in allowing the
State to introduce Harris's prior inconsistent statement
for impeachment purposes.

*Gudinas*, 693 So.2d at 964; Exh. E.

Thus, the Florida Supreme Court determined that Fred Harris'
tape recorded statement was not hearsay, but instead was admitted
for impeachment purposes.   What is or is not hearsay evidence in
a State trial is governed by State law.  *Gochicoa v. Johnson*, 118
F.3d 440, 445 (5th Cir. 1997).  Significantly, the United States
Supreme Court in *California v. Green*, 399 U.S. 149 (1970), noted
that "where the declarant is not absent, but is present to testify
and to submit to cross-examination, our cases, if anything, support
the conclusion that the admission of his out-of-court statements do
not create a confrontation problem."  *Id.* at 162.  Consequently,

the Florida Supreme Court's decision that Fred Harris' previous taped recorded statement was properly admitted is not contrary to, or an unreasonable application of, clearly-established federal law as determined by the United States Supreme Court, or an unreasonable determination of the facts in light of the evidence presented.  The Court denies Ground 5 as without merit.

**Ground 6**
**Irrelevant prejudicial collateral evidence and counsel's failure to preserve the issue denied Gudinas due process, a fair trial, and effective assistance of counsel guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.** [Petition at 7, Memorandum at 12-13].

Petitioner identifies statements made by witnesses Wrigley and Harris[13] and argues that the statements were hearsay.  Petition at 7.  Petitioner notes that before defense counsel could object, the trial court cautioned the witness or offered a curative instruction.  *Id.*  The trial court denied defense counsel's motions for a mistrial.  *Id.*  The Florida Supreme Court denied the claim on direct appeal.  Memorandum at 12.  Petitioner argues that the State court decision did not "apply applicable Supreme Court law in rendering its decision."  In support, Petitioner cites to *Lisenba v. California*, 314 U.S. 219, 236 (1941) and *Barber v. Page*, 390

---

[13] "Witness Wrigley testified that, 'I told Fred [Harris] that I was going [to] call the police if he really thinks that [Gudinas] did it.'" Petition at 7.  "Harris testified that Gudinas said of composite suspect drawings that 'none of them look like me.'  When the State asked why Mr. Gudinas said that, Harris replied, 'He said that he had some charges pending in North Carolina due to a grand theft auto.'" *Id.*

U.S. 719, 724025 (1968). *Id.* In a footnote, Petitioner assigns blame to the trial court for "compounded prejudice." *Id.* at n.7. Specifically, Petitioner claims that the court "repeated the prejudicial testimony" when giving a curative instruction to the jury. *Id.*

### (a) Exhaustion and Procedural Default:

Respondents argue that this ground was only raised to the State Court on State law grounds, and thus was not fairly presented to the State courts, and is procedurally defaulted. Response at 62. Respondents also argue that Petitioner did not raise an ineffective assistance of counsel claim in his Rule 3.850 motion in connection with this issue and such claim is also procedurally barred. *Id.* at n.13. Nor did Petitioner assign blame to the trial court for the "compounded prejudice" to the State court that he now raises before this Court. *Id.* In the alternative, Respondents argue that the Florida Supreme Court correctly decided the claim that was presented to it, and the denial of relief is neither contrary to, nor an unreasonable application of, clearly established federal law. *Id.*

Upon review of the record, the Court finds that this Ground, in its present constitutionalized form, was not raised below to the State court. *See generally* Exh. B at 55-57. Indeed, on direct appeal, Petitioner only asserted that "the trial court's rule regarding one lawyer - - one witness violates [Petitioner's]

constitutional right to effective assistance of counsel under the Sixth Amendment of the United States Constitution. . . " *Id.* at 56. Otherwise, Petitioner's direct appeal brief is silent as to the federal dimension of the alleged hearsay statements offered by witnesses Wrigley and Harris, or the trial court's error in compounding the alleged prejudice.

Consequently, the Court finds that the federal dimension of Ground 6 was not fairly presented to the Florida Supreme Court, and that Petitioner has not shown cause and prejudice or a fundamental miscarriage of justice, which would excuse such lack of presentation. Therefore, the Court finds that Ground 6, in its entirety, is procedurally defaulted.

**(b) Alternative Merits Determination:**

In the alternative, the Court finds Ground 6 without merit. The Florida Supreme Court rejected Petitioner's claim of error regarding Frank Wrigley's testimony "as procedurally barred because no specific, contemporaneous objection was made." *Gudinas*, 693 So. 2d at 964; Exh. E.  In Florida, "except in cases of fundamental error, an appellate court will not consider an issue unless it was presented to the lower court." *Steinhorst v. State*, 412 So. 2d 338 (Fla. 1982).  Here, the Florida Supreme Court applied its preservation issue and deemed this aspect of Petitioner's claims for relief procedurally barred, and the Court will honor the Florida Supreme Court's holding. *Harris v. Reed*, 489 U.S. 255, 260

(1989).  While constitutionally ineffective assistance of counsel can constitute cause, here, Petitioner's ineffectiveness claim is itself procedurally defaulted.  *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000).  Consequently, Petitioner has not shown cause and prejudice or a fundamental miscarriage of justice to excuse the procedural default as to this issue of Ground 6.

With respect to the issue of Fred Harris' statement regarding Gudinas' pending charges in North Carolina, the Florida Supreme Court found that "the trial judge did not abuse his discretion in denying Gudinas' motion for mistrial."  *Gudinas*, 693 So.2d at 964; Exh. E.  The court found that the statement did not deny Gudinas a fair trial because "[t]his was an isolated comment which the judge dealt with swiftly and decisively by issuing a curative instruction."  *Id*.   The United States Supreme Court "presume[s] that a jury will follow an instruction to disregard inadmissible evidence. . . ."  *Greer v. Miller*, 483 U.S. 756, 767, n. 8 (1987). Thus, the Court finds that Petitioner has failed to show that the Florida Supreme Court's decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or an unreasonable determination of the facts in light of the evidence presented.  In the Alternative, the Court denies Ground 6 as without merit.

**Ground 7**
**The State amended the indictment by jury instruction and argument, resulting in a verdict insufficient as a matter of law, denying Gudinas due process, a fair trial, and**

**effective counsel as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.** [Petition at 8, Memorandum at 13-15].

Petitioner states that it moved for the trial court to prohibit the State from argument or instruction on felony murder, because the indictment had charged Gudinas with only premeditated murder. Petition at 8. The trial court denied the motion and the State argued both theories (felony murder and premeditated murder) at trial, and the trial court instructed the jury "to mark first degree murder if the jury found **either** premeditated **or** felony murder." *Id.* (emphasis in original). The jury returned a verdict of guilty of "murder in the first degree, as charged in the indictment." *Id.* Petitioner argues that because the jury's verdict did not distinguish between premeditated and felony murder, "it is impossible to know which of the two theories (premeditated murder or felony murder) the jury relied upon in reaching the verdict." *Id.* Petitioner contends that the "evidence does not support a conviction for premeditated murder." *Id.* Thus, Petitioner argues that the verdict violates the Constitution. *Id.* In support, Petitioner refers the Court to *Mills v. Maryland*, 486 U.S. 367 (1988), in which the Supreme Court held that "the jury's verdict must be set aside if it could be supported on one ground but not on another, and the reviewing court was uncertain which of the two grounds was relied upon by the jury in reaching the verdict." *Id.* at 376.

**(a) Exhaustion and Procedural Default**

Respondent argues that this claim was not raised in its present "constitutionalized" form on direct appeal, has never been fairly presented to the State courts; and, thus, is procedurally defaulted.  Response at 64.  In the alternative, the Respondent argues that the Florida Supreme Court's decision is neither contrary to law nor an unreasonable application of federal law. *Id*.  Further, Respondent argues that Petitioner's ineffective assistance of counsel claim is insufficiently pled; and, nonetheless, the claim was not raised in Petitioner's Rule 3.850 motion and is now procedurally defaulted.  *Id*.

In Petitioner's brief on direct appeal, Petitioner framed the above Ground as follows:

Point VIII

> The trial court erred in denying appellant's motion in limine, allowing the State to argue both premeditated and felony murder, and this court should additionally vacate the convictions and sentences for sexual battery on double jeopardy grounds.

Exh. B at 58.  In support of this claim, Gudinas raised the same argument as set forth in the Petition, also directing the Florida court to the United State Supreme Court's holding in *Mills v. Maryland*, 486 U.S. at 376.  Petitioner also raised a second claim of double jeopardy, which is not raised in the instant Petition.

Based upon the record, the Court finds that Petitioner did sufficiently present the substance of the federal dimension of

Ground 7 to the State court.  Consequently, the Court will review the claim on the merits.

**(b) Merits Determination:**

The Florida Supreme Court rejected Petitioner's claim of trial court error in connection with its denial of Gudinas' motion *in limine* as follows:[14]

> Gudinas claims the trial court erroneously denied his motion *in limine* which averred that since the indictment charged only premeditated murder, the State should not argue nor should the jury be instructed concerning felony murder.  We disagree.
>
> We have repeatedly rejected claims that it is error for a trial court to allow the State to pursue a felony murder theory when the indictment gave no notice of the theory.  *Armstrong v. State,* 642 So. 2d 730, 737 (Fla. 1994), *cert. denied,* 514 U.S. 1085, 115 S.Ct. 1799, 131 L.Ed.2d 726 (1995); *Lovette v. State,* 636 So. 2d 1304 (Fla. 1994); *Bush v. State,* 461 So. 2d 936 (Fla. 1984), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1237, 89 L.Ed.2d 345 (1986).

*Gudinas v. State*, 693 So. 2d at 964; Exh. E.

Notably, the Florida Supreme Court did not specifically discuss this ground in terms of a federal Constitutional claim. Nonetheless, the Florida Supreme Court's decision would be deemed sufficient to constitute an adjudication on the merits of the issue, denying this ground.  *Ferguson v. Culliver*, 527 F.3d at 1146.

---

[14]Although not relevant to the issue before the Court, the Florida Supreme Court found Gudinas' double jeopardy argument procedurally barred, and otherwise without merit.  *Gudinas v. State*, 693 So. 2d at 965.

The Court finds that the Florida Supreme Court's denial of this federal constitutional claim was not contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or an unreasonable determination of the facts in light of the evidence presented. Gudinas contends that he is entitled to federal habeas relief under *Mills v. Maryland,* 486 U.S. at 376. Memorandum at 13, Reply at 8. Petitioner takes the holding from *Mills* out of context. In *Mills*, the United State Supreme Court determined that the "Constitution prohibits a State from requiring jurors unanimously to agree that a particular mitigating circumstance exists before they are permitted to consider that circumstance in their sentencing determination." *Horn v. Banks*, 536 U.S. 266, 268 (2002); *Rodriguez v. Colorado*, 498 U.S. 1055, 1056 (recognizing the relevant issue addressed in Mills was "the constitutionality of instructions requiring juror unanimity on mitigating factors"). Thus, the Supreme Court, in *Mills*, announced a new rule of law as regards the issue of unanimity required by jurors as to mitigation in reaching their verdict. *Mills*, 486 U.S. at 374.

The *Mills* Court, however, relied upon its previous general holdings in *Yates v. United States*, 354 U.S. 298, 312 (1957) and *Stromberg v. California*, 283 U.S. 359, 367-68 (1931) for the proposition that "[w]ith respect to findings of guilt on criminal charges, the Court consistently has followed the rule that the

jury's verdict must be set aside if it could be supported on one ground but not on the other, and the reviewing court was uncertain which of the two grounds was relied upon by the jury in reaching the verdict." *Mills* at 376.

In *Yates,* the defendants were charged in a single count with (1) conspiring to advocate the overthrow of the government (the "advocacy" charge); and, (2) conspiring to organize as the Communist Party, a society that advocates the overthrow of the government (the "organizing" charge). The defendants were convicted, but the jury's general verdict did not indicate whether the jury found them guilty on the "advocacy" charge or the "organizing" charge. Because the "organizing" charge was barred by the applicable statute of limitations, the Supreme Court, citing to *Stromberg v. California,* 283 U.S. 359 (1931), determined that the verdict must be set aside since it was impossible to determine on which charge the jury found defendants guilty. *Yates*, 354 U.S. at 312.[15] Thus, *Yates* stands for the proposition that a general verdict form is inadequate only where it rests on multiple bases, one of which is illegally inadequate.

In *Stromberg*, the defendant was charged with violating a California statute that forbid display of a red flag for the

---

[15]The United States Supreme Court overruled *Yates* to the extent that it held that a defendant waives his right to a judgment of acquittal to the extent that he also seeks a new trial as one of his remedies. *Burks v. U.S.*, 437 U.S. 1, 18 (1978).

purposes of: (1) opposing the government; (2) inviting anarchistic action; or, (3) aiding seditious propaganda. *Stromberg v. California*, 238 U.S. 359.  The United States Supreme Court ruled that the first clause of the statute violated the free speech provision of the First Amendment; and, thus was invalid on its face. *Id*. at 370.  Because the defendant was convicted by a general verdict form and the Court could not determine on which clause the jury found defendant guilty; and, because the Court deemed the first clause unconstitutional, the Court set the conviction aside. *Id*.  Thus, *Stromberg* stands for the proposition that a general verdict form is inadequate where it rests on multiple bases, one of which is unconstitutional.

Here, Petitioner is not entitled to any relief on the basis of *Yates* or any of its progeny because, in Florida, it is legally permissible to proceed on a theory of felony murder even though the indictment charges premeditated murder.  In contrast to *Yates* and *Stromberg*, Petitioner's case is properly governed by *Griffin v. U.S.*, 502 U.S. 46, 56 (1991).  In *Griffin*, the United States Supreme Court refused to extend the *Yates* and *Stromberg* holdings to a claim that a general verdict form must be set aside because one of the bases of conviction is "unsupported by sufficient evidence." *Id*. at 56.  Petitioner's case is more akin to *Griffin*, and further distinguishable from *Yates,* because Petitioner challenges the verdict form on an alleged insufficiency of the evidence to support

one of the bases of conviction, namely premeditated murder. Nonetheless, it is not controverted, even by Petitioner, that the evidence of record supports Gudinas' conviction on felony murder.[16] Consequently, Petitioner can show no constitutional violation based upon the general verdict form. *See also Knight v. Dugger,* 863 F.2d 705, 725 (11th Cir. 1988)(noting that Florida law has long recognized that the prosecution may proceed on either felony murder or premeditated murder when the indictment charges only the offense of first degree murder or premeditated murder, and finding that even if the trial court erred in permitting the State to proceed on both theories the "[Court] is convinced that such error was not of a constitutional dimension. The benefit to the state from the error (if any was committed) did not contribute to Petitioner's

---

[16]Indeed, contrary to Petitioner's claim, the evidence of record also arguably supports a premeditated murder conviction. "Premeditation can be shown by circumstantial evidence. Premeditation is a fully-formed conscious purpose to kill, which exists in the mind of the perpetrator for a sufficient length of time to permit of reflection, and in pursuance of which an act of killing ensues. Premeditation does not have to be contemplated for any particular period of time before the act, and may occur a moment before the act. Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed and the nature and manner of the wounds inflicted. It must exist for such time before the homicide as will enable the accused to be conscious of the nature of the deed he is about to commit and the probable result to flow from it insofar as the life of his victim is concerned." *Sireci v. State*, 399 So. 2d 964 (Fla. 1981)(internal citations omitted), *cert. denied*, 456 U.S. 984 (1982), *overruled on other grounds Pope v. State*, 441 So. 2d 1073 (Fla. 1983).

conviction since there was ample evidence upon which to base a conviction under either theory.").

Because Petitioner cannot show that the State court's decision and rejection of the claim was either contrary to, or an unreasonable application of federal law, or an unreasonable determination of the facts based upon the evidence, Petitioner is not entitled to relief on this ground.  Thus, Ground 7 is denied as without merit.

**Ground 8**
**Trial court restricted presentation of defense evidence, denying Gudinas due process and a trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United State Constitution.**  [Petition at 9, Memorandum at 15-16].

Petitioner called Detective Griffin as his only witness during the guilt phase of his trial.  Petition at 9.  Griffin offered testimony as to other leads the police were investigating.  *Id*. Griffin testified that David Colbert was a police suspect in the case, and repeatedly called the victim's home after her death to hear the victim's voice on her answering machine.  *Id*.  Griffin described Colbert as "rather strange."  *Id*.  Petitioner states that the "trial court's unreasonably strict adherence to state hearsay rules confounded Tommy Gudinas' defense and denied [the defense] a proper adversarial testing."  Memorandum at 15.  Petitioner states that "[t]here was no physical evidence connecting Tommy Gudinas to the murder."  *Id*. at 15-16.  In support of this Ground, Petitioner refers the Court to the United States Supreme Court's decisions in

*Washington v. State*, 388 U.S. 14 (1967), *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973), and *United States v. Nixon*, 418 U.S. 683, 709 (1974).  Petitioner concedes that the Florida Supreme Court "identified the correct legal standard," but vaguely contends, without further elaboration, that the State court "applied it unreasonably (by not applying it) to the facts of the case."  *Id*. Thus, Petitioner concludes that the Florida Supreme Court's decision "was contrary to clearly established federal law."  *Id.*

Respondents acknowledge that this Ground was raised below, but submit that the Florida Supreme "Court decided this claim in a fashion that is neither contrary to, nor an unreasonable application of, clearly established federal law."  Response at 65-66.  In addition, Respondent argues that "Gudinas has not established that the State Court ruling is an unreasonable determination of the facts in light of the evidence presented." *Id.* at 66.

Upon review of the record, the Florida Supreme Court held that Gudinas' claim was without merit as follows:

> Gudinas claims the trial court erroneously restricted his presentation of the evidence, thus denying him a fair trial. Detective Griffin, the only witness called by Gudinas during his case-in-chief, testified that the police developed over four hundred leads in the case. One of the suspects was David Colbert, a man allegedly infatuated with Michelle McGrath.  Gudinas claims that while Griffin testified about Colbert, the trial court "sustained numerous relevance objections by the State and thus restricted evidence of [his] defense."  We disagree.

The record supports the State's assertion that it made only one relevance objection during Detective Griffin's testimony, which was overruled; three hearsay objections which were properly sustained; and an objection based on speculation, which was also properly sustained.  We also agree with the State that the rules of evidence are not suspended because Gudinas chose to present only one witness in his guilt phase defense and forfeited his final closing argument.   That was a tactical decision made at trial by Gudinas for which the trial court cannot now be found in error.

Furthermore, the trial court properly sustained the State's hearsay objections when the testimony did not come within any exception. *Crump v. State,* 622 So.2d 963 (Fla. 1993).  In *Crump,* we affirmed the trial court's exclusion of a detective's interviews with other potential suspects on the ground that the substance of the interviews was hearsay that did not come within any of the hearsay exceptions.  *Id.* at 969.   Therefore, despite the fact that *Crump* was a capital case, we reaffirmed that the rules of evidence are still applicable during the defendant's presentation of his defense.

Finally, we agree with the State that *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), was limited to its facts due to the peculiarities of Mississippi evidence law which did not recognize a hearsay exception for declarations against penal interest.   In *Chambers,* the Mississippi Supreme Court approved the exclusion of the testimony of three separate witnesses, who each would have testified to three statements made by Gable McDonald implicating himself as the murderer.  *Id.* at 298. The court affirmed the trial court's ruling on the ground that this testimony was hearsay not within any exception.  *Id.*

On review, the United States Supreme Court reversed, concluding "that the exclusion of this critical evidence, coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process." *Id.* at 302, 93 S.Ct. at 1049.   The Supreme Court then stressed the narrowness of its holding, stating "we establish no new principles of constitutional law.  Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment

and implementation of their own criminal trial rules and
their procedures." *Id.* at 302-03, 93 S.Ct. at 1049.

In contrast, no such denial of due process occurred in
this case.  Gudinas was able to question Detective
Griffin about David Colbert and any other potential
suspects. Moreover, Detective Griffin testified that the
police ultimately eliminated Colbert as a suspect.  No
exculpatory evidence was excluded which would have
benefitted Gudinas' defense, denying him a fair trial in
accordance with fundamental standards of due process.
Thus, no *Chambers* issue exists and therefore Gudinas'
claim is without merit.

*Gudinas*, 693 So.2d at 965; Exh. E.

In *Chambers v. Mississippi*, the United States Supreme Court

recognized that in certain "circumstances, where constitutional

rights directly affecting the ascertainment of guilt are

implicated, the hearsay rule may not be applied mechanistically to

defeat the ends of justice." *Chambers*, 410 U.S. at 302.  The

critical inquiry in *Chambers* necessitates an understanding of the

unique "circumstances" that were presented to the *Chambers* Court.

In *Chambers*, the defendant Leon Chambers, who was on trial for

murder, was not permitted to cross-examine Gable McDonald, the

person who had repeatedly confessed to the murder, and in fact had

given a sworn confession (albeit later rescinded), due to the

state's "voucher"[17] rule.  *Id.* at  291.  The trial court also

---

[17]Missippi's voucher rule prohibits a party from impeaching his
own witness, unless the witness is adverse.  *Chambers v.
Mississippi*, 410 U.S. at 295-96.  The purpose of the voucher rule
was that the party who called a witness vouched for the witness'
credibility.  *Id*.  The trial court ruled that McDonald was not
adverse to defendant Chambers.  *Id*.

prohibited the defendant from calling any of McDonald's several friends who had heard McDonald confess on the grounds of hearsay.[18] *Id*. at 298. The Supreme Court reversed the defendant's conviction on the basis that Mississippi's rules of evidence conflicted with the defendant's right "to present witnesses in his own defense." *Id*. at 302. The Court was persuaded that the hearsay in question bore "assurances of trustworthiness" including corroboration with other evidence and was exculpatory evidence. *Id*. The right to present evidence on one's behalf is not without limitation, and "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Id*. at 295. Thus, "[i]n applying its evidentiary rules a State must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's right to testify." *Rock v. Arkansas*, 483 U.S. 44, 56 (1987). Consequently, the Supreme Court has recognized a relaxation of the hearsay rules in permitting evidence relevant to a capital defendant's mitigation defense. *Green v. Georgia*, 442 U.S. 95, 97 (1979); *Sears v. Upton* ___ U.S. ___, 130 S.Ct. 3259, 3263 (2010).

A review of the record reveals that the State raised four objections during Detective Griffin's direct examination by the defense, three of which were sustained. Exh. A17 at 716-720.

---

[18]At the time of the trial, Mississippi did not recognize a hearsay exception for declarations against penal interest. *Id*. at 299-300.

Detective Griffin testified that there were over 400 leads developed in the case, and witnesses stated that Mr. Colbert was with Ms. McGrath earlier that evening and had given her a rose, and Griffin found "Mr. Colbert's personality strange." Exh. A17 at 718. Over the State's relevancy and speculation objections, Detective Griffin was permitted to testify that Colbert told him that "he'd been calling Michelle's answering service just to listen to her voice" after the murder. *Id*. The trial court sustained the State's hearsay objection to defense's question about what other people said about Colbert "acting strange." *Id*. at 718. The trial court also sustained the State's hearsay objection to defense's question about whether Mr. Colbert was Ms. McGrath's "former boyfriend," because Detective Griffin testified that he had no personal knowledge of the fact. *Id*. at 719. Last, the trial court sustained the State's objection as to whether Detective Griffin thought Colbert appeared to "be obsessed" with Ms. McGrath on the grounds of speculation. *Id.* However, Detective Griffin did testify that Mr. Colbert appeared "very interested" in Ms. McGrath. *Id.* During his cross-examination by the State, Detective Griffin testified that the police has eliminated Mr. Colbert as a suspect in Ms. McGrath's murder. *Id*. at 719-720.

Petitioner suggests that the facts in the instant case are materially indistinguishable from *Chambers*. To the contrary, Florida law, under its hearsay exceptions, would have permitted the

very testimony that Mississippi law precluded in *Chambers* had it existed in this case. *See* Section 90.804 of the Florida Evidence Code, § 90.804, Fla. Stat. (1991). Such indistinguishable evidence does not exist. There is no evidence, or even suggestion, that Colbert had ever admitted to Michelle McGrath's murder, and the police cleared Colbert as a suspect. Gudinas did, however, admit to his roommates that he murdered and raped Ms. McGrath. Thus, *Chambers* is not on point.

Nor is *Washington v. State*, 388 U.S. 14, on point. In *Washington,* the defendant was not permitted to call a person who had been convicted as a participant in the same crime as a witness, due to a Texas statute that prohibited co-defendants from testifying at each other's trials. *Washington*, 388 U.S. at 16-17. Petitioner also cites to *United States v. Nixon*, 418 U.S. at 708, as authority without any elaboration. The Court cannot independently glean how *Nixon* is relevant to the instant case, except for the broad proposition that our adversarial system depends upon the disclosure of all facts **"within the framework of the rules of evidence,"** which limitation this Court finds pertinent. *Nixon, Id.* at 709 (emphasis added).

Further, the Court would be remiss if it did not take issue with Petitioner's statement that there was "no physical evidence" to connect Gudinas to Ms. McGrath's murder. Memorandum at 15-16. Significantly, Gudinas' palm print was found on the push bar of the

gate from the courtyard where Ms. McGrath's body was found, and both his left and right fingerprints were found on a payment book inside Ms. McGrath's vehicle.  Exh. A16 at 559-563.

Based upon the foregoing, the Court finds that the Florida Supreme Court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law, nor an unreasonable determination of the facts in light of the evidence presented.  The Court denies Petitioner relief on Ground 8 as without merit.

**Ground 9**
**Prosecutorial misconduct in the penalty phase denied Gudinas due process, a fair trial, and effective assistance of counsel guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments.** [Petition at 10, Memorandum at 16-25]

Petitioner claims that the prosecutor during closing in the penalty phase committed the following acts of misconduct: (1) invited jury to put themselves in the "place of the victim"; (2) argued to the jury that they should limit their consideration of mitigation and Gudinas' background; (3) argues Gudinas' extreme emotional stress should not be considered because "he was always that way"; (4) described Gudinas as a "maniac, monster, evil human being, born bad, bad to the bone"; (5) argued events after the victim's death in support of the heinous, atrocious and cruel aggravator; and, (6) told the jury to "ignore the law." Petition at 11.  In support, Petitioner argues that the prosecutor's misconduct "rendered the entire trial fundamentally unfair."

Memorandum at 18.  Petitioner avers that the prosecution sought to obtain "an emotional response and not the deliberate verdict" approved by the United States Supreme Court in *Proffitt v. Florida*, 428 U.S. 242 (1976).  *Id*.  In particular, Petitioner states that "[m]uch of the prosecutor's closing argument was designed to return a recommendation based on terror and emotion and not the principles of retribution and deterrence necessary for imposition of the death penalty."  *Id*. at 19, *citing to Gregg v. Georgia*, 428 U.S. 153, 183 (1976).

Petitioner acknowledges that defense counsel failed to contemporaneously object during the prosecutor's closing argument as to each of these instances of misconduct; and, thus, on direct appeal, the Florida Supreme Court found Gudinas' claim of prosecutorial misconduct procedurally barred.  *Id*. at 23. Petitioner argues that this Court is not prevented from reviewing this claim because the Florida Supreme Court has not "consistently enforce[d] the procedural bar."  *Id*. at 24-25.  Although not citing to ineffective assistance of counsel as "cause for and prejudice" to excuse his default, Petitioner does state that he raised trial counsel's ineffectiveness as regards the prosecutorial misconduct in his Rule 3.850 motion.  *Id*. at 24.  Petitioner also argues that the Florida Supreme Court's refusal to address the merits of his ineffectiveness claim because of its finding that the claims were

procedurally barred on direct appeal is "unprecedented" and was "unfairly applied" and thus, is "not adequate." *Id.* at 24.

(**a**)   **Procedural Bar/Procedural Default:**

Respondents argue that the Florida Supreme Court's finding of a procedural bar constitutes an independent state basis for denying relief without federal consideration of the merits.  Response at 68.  Respondents also argue that Petitioner sought only an evidentiary hearing as relief in his Rule 3.850 motion on his ineffective assistance of counsel claims which is not the same Constitutional claim Petitioner now raises before this Court.  *Id.* Consequently, Respondents contend that Petitioner's currently framed ineffectiveness claim has not been fairly presented to the State court and is, itself, procedurally defaulted.  *Id.*  In the alternative, Respondents argue that, even if counsel had objected, there is no reasonable likelihood of a different result because "under any view of the facts, this crime is horrible." *Id.* at 71.

Petitioner raised this Ground of prosecutorial misconduct, in conjunction with his claim challenging the jury instructions, as "Point X" in his direct appeal brief.  Exh. B at 62-68.  Because Petitioner did not object to the prosecutor's closing argument during the penalty phase, and because the Florida Supreme Court did not determine that the claim constituted fundamental error, it held that Petitioner's "claim (10) is procedurally barred because no contemporaneous objection was made to the prosecutor's argument and

the jury instruction issue was not raised at trial." *Gudinas*, 693 So. 2d at 959.  Thus, this Ground was not preserved for appeal and the Court agrees the Ground is procedurally barred.

A federal court "will not take up a question of federal law presented in a case 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'"  *Lee v. Kemna*, 534 U.S. 362, 375 (2002) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). "Federal courts are barred from reaching the merits of a state prisoner's federal habeas claim where the petitioner has failed to comply with an independent and adequate state procedural rule." *Siebert v. Allen*, 455 F.3d 1269, 1271 (11th Cir. 2006) (citing *Wainwright v. Sykes*, 433 U.S. 72, 85-86 (1977)); *Spencer v. Sec'y, Dep't of Corr.*, 609 F.3d 1170, 1178 (11th Cir. 2010)(stating "[i]t is by now abundantly clear that [a federal habeas court] cannot consider a claim where the last state court rendering judgement in the case clearly and expressly stated that its judgment rests on a state procedural rule.")(internal quotations and citations omitted).  "To determine whether a state procedural bar constitutes an independent and adequate state rule of decision, the last state court rendering judgment must clearly and expressly state that it is relying on a state procedural rule to resolve the federal claim, must not decide the claim on the merits, and must base its decision entirely on an 'adequate' state procedural rule." *Lynd v. Terry*,

470 F.3d 1308, 1313 n.4 (11th Cir. 2006) (citing *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)).

All three elements are satisfied here. First, the last state court rendering judgment, the Florida Supreme Court, clearly and expressly stated that it is relying on the state procedural rule, which barred consideration of a claim where there had been no objection made at the trial court level. *Gudinas*, 693 So. 2d at 959. Second, the Florida Supreme Court did not decide the claim on the merits. *Id.* Third, the Florida Supreme Court's decision was based entirely on an adequate state procedural rule that it regularly follows. *See, e.g., Wyatt v. State*, 641 So. 2d 355, 358-59 (Fla. 1994) (refusing to lift procedural bar where defense attorney failed to object to closing argument which did not amount to fundamental error); *Allen v. State*, 662 So. 2d 323, 331 (Fla. 1995)(recognizing claim that prosecutor inflamed jury by improper argument not preserved for appeal because no contemporaneous objection at trial).

(**b**) **Cause For and Prejudice to Excuse Procedural Default:**

Although not entirely clear, Petitioner attempts to get around the procedural bar by raising counsel's failure to preserve this claim as an ineffective assistance of counsel claim as cause for his default, and prejudice as a result thereof. Reply at 10-11. "As a general rule, claims forfeited under state law may support federal habeas relief only if the prisoner demonstrates causes for

the default and prejudice from the asserted error." *House v. Bell*, 547 U.S. 518, 536 (2006)(citations omitted).  As stated earlier, constitutionally ineffective assistance of counsel can constitute cause if that claim is not itself procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. at 451-52.  A petitioner asserting "prejudice," must demonstrate that there is "at least a reasonable probability that the result of the proceeding would have been different." *Henderson*, 353 F.3d at 892.  Here, to prevail on his claim that counsel was ineffective in failing to object during the penalty phase to the prosecutor's misconduct during closing, Petitioner must show that the prosecutor's improprieties so infected the penalty phase of the trial with such unfairness that the proceeding constitutes a denial of due process. *Tucker v. Kemp*, 802 F. 2d 1293, 1296 (11th Cir. 2006)(*citing Darden v. Wainwright*, 477 U.S. 168, 182 (1986)).

In Petitioner's Rule 3.850, Petitioner claimed that trial counsel rendered ineffective assistance, in violation of Gudinas' Sixth, Eighth and Fourteenth Amendment rights, when counsel failed to object to the prosecutor's acts of misconduct during the prosecutor's closing.  Exh. G3 at 34 (Claim IV).  In particular, Petitioner asserted that trial counsel failed to object to the following comments made by Mr. Ashton, the State prosecutor during his argument in the penalty phase:

1.    Mr. Ashton called Gudinas a maniac: "She had time to think what this maniac was going to do to her in this dark and secluded alleyway."

2.    Mr. Ashton called Gudinas a monster: "I suggest to you ladies and gentlemen, this is not a mental or emotional disturbance. He is not psychotic.  He was not under the influence of some schizophrenic disease.  He is simply being Thomas Gudinas. And Thomas Gudinas is a monster.  Deep into his heart and soul, he is a monster.  That's what he was.  That's what he is.  That's part of him.  If you take that away there is no Thomas Gudinas."

3.    Mr. Ashton called Gudinas "an evil human being."

4.    Mr. Ashton called Gudinas bad to the bone: "Some people are born bad.  They're bad to the bone.  Thomas Gudinas is bad to the bone.  He has never done a good thing in his life.  He has never done a single thing to help himself or help anyone else. All he has brought to our society is evil.  And he is bad to the bone.  There is, unfortunately, as sad as it is to say, such things as a bad boy.  And you see one in front of you."

5.    Mr. Ashton told the jurors Gudinas cannot be cured: "Some people you just don't cure.  There's some  people you just can't cure."

*Id.* at 34-36.

    The postconviction court denied Petitioner relief on this

claim, as follows:

    After the State's closing, the defense moved for a mistrial based upon the characterizations of the Defendant as a "monster." (T309) The trial court denied the motion. (T310)  The Supreme Court declined to consider this claim because there was no contemporaneous objection made at trial. *See Gudinas*, 693 So. 2d at 959. Accordingly, the Defendant now raises this issue as an ineffective assistance claim.

    The references to the Defendant as a "maniac" and a "monster" in comments 1 and 2 were clearly inappropriate. The Third District Court of Appeal has stated that, "[i]t is improper in the prosecution of persons charged with crime for the representative of the state to apply offensive epithets to defendants or their witnesses, and

to engage in vituperative characterizations of them."
*See Green v. State*, 427 So. 2d 1036, 1038 (Fla. 3d DCA 1983). Accordingly, defense counsel's failure to object to these characterizations and to seek curative instructions was deficient performance. Nonetheless, the Defendant has not alleged how the outcome of his trial would have been different had counsel properly objected to the State's comments. After hearing evidence of the vicious nature of the crime and the numerous injuries inflicted upon the victim, in addition to the overwhelming evidence of the Defendant's guilt, there is no reasonable possibility that these comments affected the jury's recommendation of death. Furthermore, defense counsel responded to these characterizations of the Defendant during closing arguments. (ST 318, 325) Because the Defendant cannot show prejudice under *Strickland*, this claim was rejected without an evidentiary hearing. *See Strickland*, 466 U.S. at 687.


In consideration of the evidence of the brutal nature of the murder and the mutilation of the victim, comment 3 does not appear to be objectionable. Also, comments 4 and 5, when considered in context, do not appear to be beyond the bounds of proper argument. The Defendant was claiming that the Massachusetts' placement facilities failed to properly address his mental health and behavioral difficulties. Thus, the Defendant's presentation of evidence sought to establish that he could be rehabilitated in some form and that long-term treatment might be of value to him. The State's arguments were made in response to these claims, and highlighted the uncontested evidence of the Defendant's extensive history of behavioral difficulties.

Moving on to another subclaim, the Defendant's ineffective assistance contention stemming from defense counsel's failure to object to the State's characterization of the extreme mental or emotional disturbance mitigating factor is rejected because the Defendant has not made any claim of prejudice. Furthermore, these comments would not have altered the jury's sentencing recommendation, and the court accepted the presence of this mitigating circumstance in the sentencing order.

Exh. G4 at 20-21.  Petitioner raised this issue as Claim II in his appeal of the denial of his Rule 3.850 motion.  Exh. I at 27-30. The Florida Supreme Court, in its order consolidating Petitioner's appeal from the denial of his Rule 3.850 motion and motion for state habeas relief, affirmed the postconviction court, finding that this claim fell within the group of claims that did not warrant "extensive discussion."  *Gudinas v. State*, 816 So. 2d at 1100; Exh. L.  Specifically, the Florida Supreme Court concluded that the claim "was substantively raised on direct appeal and rejected."  *Id.* at n.4.[19]  Consequently, the Court will review this Ground under the deferential standard of review.

Here, both the postconviction and the Florida Supreme Court correctly recognized that *Strickland* governs ineffective assistance of counsel claims.  Thus, Petitioner cannot meet the "contrary to" test set forth in § 2254(d)(1).  In order to prevail on this claim, Petitioner must demonstrate that the State court unreasonably applied *Strickland* or unreasonably determined the facts in his case.

The postconviction court found that the prosecutor's references to Gudinas as a "maniac" and "monster" were improper and deemed counsel deficient for failing to contemporaneously object to these comments.[20]  The State court concluded that the prosecutor's

---

[19]The Florida Supreme Court identified the claim as "3a."

[20]Counsel did object at the conclusion of the prosecutor's

(continued...)

statement that Gudinas was an "evil human being" was a fair comment on the evidence, in light of the extent of Ms. McGrath's mutilation. Finally, the court determined that the comments that Gudinas was "bad to the bone" and "cannot be cured" were not objectionable in the context in which the comments were made. Even conceding that counsel was deficient, the State court nonetheless found Petitioner could not establish the prejudicial prong of *Strickland*.

Here, the Court finds that the State court neither unreasonably applied *Strickland* or unreasonably determined the facts in Gudinas' case. In relevant part, the Court agrees that, even if counsel was ineffective for failing to object to the prosecutor's improprieties, the prosecutor's comments did not render the penalty phase proceeding fundamentally unfair. *Darden v. Wainwright*, 477 U.S. at 182 (recognizing that relief is not mandated even if the misconduct "deserves the condemnation it has received from every court to review it.").

The Court has considered the objectionable remarks against the totality of the facts and the circumstances. *Hall v. Wainwright*, 733 F.2d 766, 773 (11th Cir. 1984). "In determining whether arguments are sufficiently egregious to result in the denial of due process," the following factors may be considered: "(1) whether the remarks were isolated, ambiguous, or unintentional; (2) whether

[20](...continued)
argument, and moved for a mistrial.

there was a contemporaneous objection by defense counsel; (3) the trial court's instructions; and (4) the weight of aggravating and mitigating factors." *Land v. Allen*, 573 F.3d 1211, 1219-20 (11th Cir. 2009). Moreover, the Court has considered "the degree to which the challenged remarks have a tendency to mislead the jury and to prejudice the accused," and "the strength of the competent proof to establish the guilt of the accused." *Davis v. Zant*, 36 F.3d 1538, 1546 (11th Cir. 1994). Thus, where the evidence of guilt is overwhelming, an improper comment by a prosecutor usually does not render the trial fundamentally unfair in violation of the Constitution. *See Land*, 573 F.3d at 1220.

Here, the transcript of the prosecutor's closing argument consists of 35 typed pages. Exh. A20 at 274-309. First, the prosecutor suggested to the jury that the first two aggravators were already established beyond a reasonable doubt: (1) that Gudinas had previously been convicted of another felony involving the use or threat of violence, due to the jury's verdict finding Gudinas guilty of count II concerning Rachelle Smith and Gudinas' 1991 Massachusetts conviction for assault with intent to commit rape and indecent assault and battery; and (2) that Gudinas committed the crime while in the commission of a sexual battery, due to the fact that the jury had already found Gudinas guilty of the sexual battery of Ms. McGrath. The prosecutor's "maniac" comment was made in isolation during the prosecutor's argument that

the   heinous, atrocious and cruel aggravator was established because Ms. McGrath was alive, alone with Gudinas in the dark alley and being subjected to torture. *Id*. at 292.  The comments referring Gudinas to a "monster" were made during the prosecutor's argument against finding the "under the influence of extreme mental or emotional disturbance" mitigator. *Id*. at 294-295.  Despite the prosecutor's reference to Gudinas as a "monster," the trial court found the "under the influence of extreme mental or emotional disturbance" mitigator was present.  Exh. A13 at 618-619. Further, defense counsel did object to the prosecutor's comment that Gudinas was a "monster," *after* the prosecutor had finished his closing argument, and moved for a mistrial,  Exh. A20 at 309, and the court, considering its impact on the entirety of the trial, denied the motion for a mistrial.  *Id*. at 310.  Defense counsel in his closing addressed the "monster" comment, nullifying it by linking it to the abuse Gudinas suffered as a young boy.  *Id*. at 318, 325.  The trial court further instructed the jury that their advisory sentence was to be based upon the evidence they heard during the guilt portion of the trial and the evidence presented during the penalty phase.  *Id*. at 330.

Based upon the foregoing, the Court finds no violation to Petitioner's due process rights.  Thus, the Court rejects Ground 9 on the merits.

**Ground 10**
**The jury recommend [sic] was tainted by improper and inadequate instruction, which denied Gudinas due process, a fair trial, and effective assistance of counsel guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.** [Petition at 11, Memorandum at 25-31]

First, Petitioner argues that the jury instruction requiring the jury to find a mitigator by the "greater weight of the evidence" was in error. Petition at 11. Petitioner asserts that the "greater weight of the evidence" modified jury instruction was contrary to *Proffit v. Florida*, 428 U.S. 242 (1976). Memorandum at 25. Petitioner claims that because the trial court did not define the "greater weight of the evidence standard," the jury "likely rejected valid mitigating evidence because they could not determine whether it was established." *Id. at 26.*

Second, Petitioner argues that the jury instruction shifted the burden to the defense to prove that death was not the appropriate penalty. Petition at 11. In particular, Petitioner objects to the trial court's instruction to the jury that "should you find sufficient aggravating circumstances to exist then it will be your duty to determine whether mitigating circumstances exist that outweigh the circumstances," as inconsistent with *State v. Dixon*, 283 So. 2d 1 (Fla. 1973). *Id.* at 26. Petitioner claims that the instruction resulted in the defense having the burden to prove that death was not appropriate, in violation of Petitioner's Due Process and Eight Amendment rights. *Id.* Petitioner states

that, "essentially" the jury was told that they need consider mitigating circumstances only if they outweigh the aggravating circumstances. *Id*. at 26-27.

Petitioner concedes that trial counsel failed to object to either of these instructions and preserve these claims for review on direct appeal. Petition at 12. In his Memorandum, Petitioner claims that trial counsel's failure to object to the enhanced instruction constituted ineffective assistance of counsel. Memorandum at 25. In the Memorandum, Petitioner also raises two additional claims of ineffective assistance of trial counsel in connection with the jury instructions. In particular, Petitioner faults counsel's failure to challenge the instructions for the "during the commission of a felony" aggravator, as well as "heinous, atrocious, and cruel" aggravator as being vague and overbroad. *Id*. at 27-31.

(**a**) **Procedurally Barred/Unexhausted:**

Respondents argue that each of Petitioner's four jury instructions claims are, as found by the Florida Supreme Court, procedurally barred. Response at 71-73. In the alternative, Respondents argue that the claims are without merit, because the instructions were not in contravention to applicable State or federal law, and are contradicted by the record. *Id*. at 73. In his Reply, Petitioner states that each of the jury instruction claims were properly raised below, and the Florida Supreme Court

"improperly found procedural bars where none existed."  Reply at 11.

The record reveals that, on direct appeal, Petitioner raised two distinct jury instruction claims, in conjunction with his numerous claims of prosecutorial misconduct during closing argument.  Exh. B (Point X) at 62-64.  In particular, Petitioner claimed trial court error, as to: (1) the inclusion of the "greater weight of the evidence" in the mitigation instruction, *Id*. at 62-62; and, (2) the denial of Petitioner's requested jury instruction that the heinous, atrocious, and cruel aggravator include language that any actions taken after the victim was unconscious or dead may not be considered to find that the actions were heinous, atrocious or cruel.  *Id*. at 62-65.  The Florida Supreme Court did not address either of these claims on the merits, finding that both of these claims were "procedurally barred" because no contemporaneous objection was made by defense counsel at trial as to either of these alleged errors.  *Gudinas*, 693 So.2d at 959; Exh E.

In his Rule 3.850 motion, Petitioner claimed that his "sentence was tainted by improper instructions" because the HAC aggravator instruction was "unconstitutionally vague," and "the use of the underlying felony as an aggravating factor" rendered the aggravator "illusory."  Exh. G3 at 42-43 (Claim VIII).  Petitioner raised a separate claim that the trial court "committed fundamental error" in its HAC aggravator jury instruction, because the limiting

instruction was vague. *Id.* at 43-44 (Claim IX). While Petitioner conceded that counsel did object to the instruction, Petitioner argued that counsel was nonetheless "ineffective to the extent that he did not present the court with the case law" regarding the issue. *Id.* Finally, in another claim, Petitioner alleged that his sentence of death was unconstitutional, because the jury instructions "shifted the burden" to Petitioner to prove death was inappropriate. *Id.* at 46-49 (Claim X).

The Florida Supreme Court denied Petitioner relief on each of these claims, finding that Petitioner's claims of ineffective assistance of counsel concerning the "during the commission of the felony instruction," and counsel's ineffectiveness for failing to object to burden shifting, "revolve around substantive issues that could have been, but were not, raised on direct appeal." *Gudinas*, 816 So.2d at 1100-01, n. 3; Exh. L.[21] Consequently, the Florida court determined that these two claims were "procedurally barred because they do not involve fundamental error and are subject to the same rule that 3.850 proceedings are not to be used as a second appeal." *Id.* The Florida Supreme Court also found the claim that counsel was ineffective for failing to object to the instruction for the "during the commission of a felony" aggravator procedurally barred, because "Gudinas attempted to attach an ineffective

---

[21]These claims were raised on appeal to the Florida Supreme Court as claim 3(j) and 3(k) respectively.

assistance of counsel allegation to this claim for the first time on appeal." *Id*. at n. 4 (citing *Doyle v. State,* 526 So.2d 909, 911 (Fla. 1988)).[22]

The Court agrees that Ground 11 raised in the instant Petition is procedurally barred.  The three grounds which preclude this Court from reviewing this claim are present: (1) the Florida Supreme Court "clearly and expressly" stated that it is relying on a state procedural rule to resolve the federal claim; (2) the Florida court did not review the claims on the merits; and (3) the procedural bar is an adequate and regularly applied procedural rule. *See Wuornos v. State*, 676 So. 2d 972, 974 (Fla. 1996) (failing to excuse the failure to object to a jury instruction in death penalty phase where the recommendation was seven-to-five as procedural bar on direct review).  Thus, the Court finds Ground 10 procedurally barred.

**(b) Alternative Merits Determination:**

The United States Supreme Court has held that, where the sentencer weighs aggravating and mitigating circumstances, like in Florida, the weighing of an invalid aggravating circumstance violates the Eighth Amendment. *See Sochor v. Florida,* 504 U.S. 527, 532 (1992); *Stringer v. Black,* 503 U.S. 222, 232 (1992); *Parker v. Dugger,* 498 U.S. 308, 319-321 (1991); *Clemons v.*

---

[22]This claim was raised on appeal to the Florida Supreme Court as claim (3)(i).

*Mississippi,* 494 U.S. 738, 752 (1990). An aggravating circumstance is invalid if its description is so vague as to leave the sentencer without sufficient guidance for determining its presence or absence. *See Stringer,* 503 U.S. at 235. In *Espinosa v. Florida, supra,* the Court determined that Florida's then-standard "heinous, atrocious and cruel" jury instruction was unconstitutionally vague because the instruction listed as an aggravating circumstance conduct that was "especially wicked, evil, atrocious or cruel," without defining any of those identified terms. After *Espinosa,* the Florida Supreme Court declared the following HAC instruction constitutional because its terms were sufficiently defined:

> [T]he crime for which the defendant is to be sentenced is especially heinous, atrocious, or cruel. Heinous means extremely wicked or shockingly evil. Atrocious means outrageously wicked or vile. Cruel means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others. The kind of crime to be included as heinous, atrocious, or cruel is one accompanied by additional acts to show that the crime was conscienceless or pitiless and was unnecessarily torturous to the victim.

*Hall v. State*, 614 So.2d 473, 478 (Fla. 1993). This same instruction was the one given in Petitioner's case. See Exh. A20 at 331-332. Additionally, the trial court further restricted the HAC aggravator to the extent that the jury was instructed "that the actions of the defendant which were taken after the victim was dead cannot be considered in determining whether the murder was especially wicked, evil, atrocious or cruel." *Id*. at 332.

Petitioner fails to identify any Supreme Court precedent in which the Court held that the HAC aggravator requires the type of limited ruling he suggests.   In fact, the Supreme Court has expressly upheld the Tennessee HAC aggravator which permits as evidence of conscienceless and pitiless the torturous acts done to a victim who is rendered unconscious, but not dead. *Bell v. Cone*, 543 U.S. 447, 459 (2005).   Because Petitioner cannot show that the State court's decision rejecting each of these claims was neither contrary to nor an unreasonable application of federal law, or an unreasonable determination of the facts based upon the evidence, Petitioner is not entitled to relief on this ground.   Thus, in the alternative, the Court denies Ground 10 on the merits

**Ground 11**
**The court's finding that the murder was especially heinous, atrocious or cruel violates the Eighth and Fourteenth Amendments to the United States Constitution.**
[Petition at 12, Memorandum 31-34].

Petitioner claims there was insufficient evidence for the trial court to find that the murder was especially heinous, atrocious and cruel, thereby violating Petitioner's Eighth and Fourteenth Amendment rights.   Petition at 12.   In particular, Petitioner argues that the evidence was insufficient, because the State could not "prove beyond a reasonable doubt that the victim was conscious during the attack so that the heinous, atrocious or cruel aggravator could apply."   Memorandum at 31.   Petitioner argues that the Florida Supreme Court "failed to state the

sufficiency test announced in *Jackson v. Virginia*, 443 U.S. 307, 319 (1970)," and did not determine whether a "rational trier of fact" could have found HAC "beyond a reasonable doubt." *Id.* at 33.

Respondents argue that Petitioner failed to demonstrate that the decision of the Florida Supreme Court was contrary to or an unreasonable application of clearly established federal law. Response at 74. Nor has Petitioner established that the Florida court's decision is an unreasonable determination of facts in light of the evidence presented. *Id.* Respondents point out that a federal habeas court's review of a State's application of a constitutional aggravator "is extremely limited." *Id.*

    **(a)   Exhaustion/Procedurally Defaulted:**

Upon review of the record, Petitioner presented this claim strictly as a sufficiency of the evidence claim to the Florida Supreme Court under Florida law, and did not raise an independent federal constitutional issue. Exh. B, at 69-74. In particular, Petitioner framed this issue as follows:

> Point XI
> The trial court erred in finding that the murder was especially heinous, atrocious, or cruel.

*Id.* at 69. Petitioner neither raised a federal issue in his direct appeal brief nor cited to any federal law in support of this claim, including *Jackson v. Virginia*, to which he now cites. *Id.* at 69-74. In fact, Petitioner only argued that "the State failed to prove beyond a reasonable doubt that Michelle McGrath was conscious

during the attack and therefore capable of feeling pain." *Id.* at
69.  Thus, the Court concludes that the federal dimension of this
Ground was not fairly presented to the Florida Supreme Court and,
therefore, the issue has not been exhausted.  Petitioner has shown
neither cause and prejudice nor a fundamental miscarriage of
justice and the issue is no longer capable of being considered by
the Florida courts.  Therefore, the Court finds that Ground 11 is
procedurally defaulted.

**(b)   Alternative Merits Determination:**

To the extent that Petitioner's incorporation paragraph set
forth in his direct appeal brief can be deemed sufficient to alert
the State court of the federal dimension of this issue, the Court,
in the alternative, will address this claim on the merits.  In
denying Petitioner relief on this claim, the Florida Supreme Court
held as follows:

> Gudinas claims that the State failed to prove beyond a
> reasonable doubt that Michelle McGrath was conscious
> during the attack.  He argues that the evidence is just
> as consistent that she was unconscious, perhaps even
> brain dead, at the outset of the attack.  Therefore,
> Gudinas asserts that the trial court abused its
> discretion in finding the heinous, atrocious, or cruel
> aggravating circumstance (HAC).  We disagree.
>
> Over the course of twelve pages, the trial court
> exhaustively laid out the aggravating circumstances,
> mitigating circumstances, supporting facts, and relevant
> testimony in its sentencing order. Regarding HAC, the
> trial court devoted three pages to Dr. Hegert's testimony
> detailing the injuries to Michelle McGrath.  The
> testimony supports the State's theory that many if not
> all of the injuries, were inflicted *before* a blow to the
> head caused unconsciousness and eventually death.  We

> believe the evidence is broad enough that a trier of fact
> could reasonably infer that the victim was conscious
> during the sexual batteries and other injuries that were
> inflicted upon her before her death. Therefore, we agree
> with the State that the trial court did not abuse its
> discretion in finding that the HAC aggravator was proven
> beyond a reasonable doubt. As in *Wuornos v. State,* 644
> So. 2d 1012, 1019 (Fla.1994), we affirm this finding
> since "the State's theory . . . prevailed, is supported
> by the facts, and has been proven beyond a reasonable
> doubt."

*Gudinas*, 693 So.2d at 965-966; Exh. E.

"The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 309 (citing *In re Winship*, 397 U.S. 358 (1970)). This Court is not required to "ask itself whether *it* believes that the evidence at the trial established guilty beyond a reasonable doubt." *Id.* at 318 (internal quotations and citations omitted, emphasis in original). "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (emphasis in original).

Turning to the specifics of the instant case, the Court concludes that, in reviewing the evidence of record in the light most favorable to the prosecution, a rational fact-finder could have readily found the HAC aggravator beyond a reasonable doubt under Florida law. The sentencing court, as supported by the testimony offered by Dr. Hegert, the Medical Examiner for Orange

and Osceola Counties, enumerated the extensive and brutal injuries

Ms. McGrath sustained:

1.   That the body of Michelle McGrath was found in nude
state, with the legs in somewhat of a flexed position.
A stick was found inserted into her vaginal opening and
a stick extending into the tissue of the rectal area.

2.   That Ms. McGrath had an area of injury extending from
the left upper or left outer forehead, beginning at the
mid-eye area and covering the outside margin of the
forehead, extending from the eye brow back to the
hairline of the forehead and head region.  This area had
a lot of hemorrhage with it around the eye.

3.   That Ms. McGrath suffered a very severe injury to the
brain surface, which took thirty minutes to an hour for
it to fully develop.  Dr. Hegert felt that this major
area of injury was possibly caused by the heel of a shoe
or boot or something similar.

4.   That Ms. McGrath suffered bruising and tearing of the
inside area of the lip.  She also had injuries to her
mouth.  That the injuries to this area were the results
of a fairly significant blow.  In describing the injuries
to this area Dr. Hegert said:

> "We then start to see some of the hemorrhage
> here, there was also a tearing of the tissue
> inside the mouth, which was along the lower
> and bottom lip as the gum line, and then also
> inside the lip along the teeth, of the level
> of the teeth of the upper jaw.  There was
> significant tearing of the membrane surface of
> the inside of the cheek that was associated
> with the blunt injury to this side, driving
> that surface of the cheek against the teeth,
> the pressure produced tearing.  That would be
> consistent with the blow to the side of the
> cheek."

5.   That Ms. McGrath suffered area of trauma to her jaw
and extensive trauma to her neck.

6.   That Ms. McGrath suffered a stab wound in the area
between the vagina and anus.  Dr. Hegert in describing
this injury said:

"This, then, is the rectum itself. And this
is the area that the stick had produced
actually a stab wound. This was a not a
penetration of the rectum with the stick, but
right, this is the vagina here, so it's right
behind that or more towards the back of the
body and penetrated, produced a wound about
three centimeters, which is little bit over a
inch to an inch and a half across, and
penetrated into the soft tissue of the pelvis,
approximately three inches."

"It produces hemorrhage, as we can see, so
this is something that happened while the
subject was still alive and is essentially a
stab wound produced by the stick, rather than
a penetration into the rectum as the stick
penetrated into the vagina."

7.   That there was evidence of bite marks and sucking
marks on the breasts of the victim.

8.   That there were abrasions on the outer lips of the
victim's vagina.

9.   That there was a quarter-inch tear of the left side
of the inner lips of the victim's vagina.

10. That at the six o'clock level of the rectal opening
of the victim there was trauma present, which consisted
of some contusions and superficial tearing of tissue.
This injury was consistent with the rectum being
penetrated by some object.
11. That the injuries to the rectal area of the victim
were produced while the victim was still alive.

12. That the abrasions and contusions on the outside of
the vagina along with injury to the lips of the vagina,
were produced while the victim was still alive.

13.   That the anus and vagina of the victim were
penetrated by some object while the victim was still
alive.

Exh. A13 at 615-616.  That the victim was alive and conscious

during a significant portion of the attack upon her is supported by

additional medical evidence.  Dr. Hegert testified that the injury

that would have caused Ms. McGrath to lose consciousness would have been the blow to the side of the head, specifically to the forehead, that caused brain injury and ultimately Ms. McGrath's death.   Exh. A16 at 442-443.   Dr. Hegert specified that if the blows to the head could be separated, the blows to Ms. McGrath's cheek and the side of her face would not have rendered her unconscious.   *Id*. at 443.   The doctor rejected defense's contention that Ms. McGrath sustained the fatal blow in the parking lot.   *Id*. at 447.   Instead, the doctor testified that the injuries inside Ms. McGrath's mouth and to her nose were consistent with the amount of blood found on the parking marker in the parking lot.   *Id*. Based upon his examination of Ms. McGrath in the alley when he arrived at 10:15 a.m., Dr. Hegert concluded that she had died somewhere between 3:00 a.m. and 5:00 a.m., but that she did not die immediately.   *Id*. at 449.

The evidence supports the State's theory that Ms. McGrath had been initially attacked in the parking garage by a blow to her mouth area and was taken to the alley fully conscious.   In particular, there were no drag marks observed in the surface area of the alley.   *Id*. at 490.   The heel of one of the victim's boots was found broken off in the alley, supporting the theory that Ms. McGrath walked on her own volition to the alley.   *Id*.   There were no abrasions on Ms. McGrath's buttocks to support defense's theory that she was dragged in an unconscious state to the alley, but she

did have abrasions on the small of her back consistent with the surface of the parking lot and her legs being raised above her as she lay on the ground.  *Id.* at 434.  The blood splatter evidence found in the alley was consistent with Ms. McGrath first sustaining a series of other injuries to her face and then being violently struck by a blunt force object to render her unconscious.  *Id.* at 443.  While the blunt force injury would have caused her unconsciousness, death still would not have been immediate, occurring "30 minutes or an hour" from the blow being inflicted.  *Id.* at 416.  Bite marks inflicted on Ms. McGrath's breasts indicate that Gudinas was straddling her head as she was lying down.  *Id.* at 429.

Based upon the foregoing, giving deference to the Florida court's disposition of this claim as required under 28 U.S.C. § 2254(e), and applying the *Jackson* standard, the Court determines that a rational trier of fact could have found that the killing of Ms. McGrath was heinous, atrocious, or cruel.[23]  Petitioner has not

---

[23]The Florida Supreme Court has held that "fear, emotional strain, and terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel." *James v. State,* 695 So. 2d 1229, 1235 (Fla. 1997).  The court has also held that "the HAC aggravator focuses on the means and manner in which death is inflicted and the immediate circumstances surrounding the death."  *Brown v. State,* 721 So.2d 274, 277 (Fla. 1998).  *See Swafford v. State,* 533 So. 2d 270, 277 (Fla. 1988) ("the victim's mental state may be evaluated for purposes of such [HAC] determination in accordance with a common-sense inference from the circumstances."); *Lynch v. State,* 841 So. 2d 362, 369 (Fla. 2003)("[T]he focus should be upon the victim's
(continued...)

demonstrated that the Florida court's disposition of this claim was contrary to, or constituted an unreasonable application of governing precedent of the United States Supreme Court. Accordingly, Ground 11 is alternatively denied as without merit.

**Ground 12**
**The trial court's error in considering mitigation renders the sentence unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution.**
[Petition at 14, Memorandum at 34-36]

Petitioner objects to the trial court's sentencing order because "it dismissed 12 substantial non-statutory mitigators in a single sentence and one statutory factor in a single page." Petition at 14. Petitioner points out that the trial court's order "lead to a dissent to the Florida Supreme Court decision." *Id*. Petitioner argues that this "summary disposition does not comport with the individual 'fair and deliberation' we have required of trial courts in determining whether to impose a death sentence." Memorandum at 34. Petitioner alleges that the trial court's "'analysis' is patently inadequate . . . ." *Id*. (*citing* dissent in *Gudinas*, 693 So.2d at 968). Petitioner claims that the Florida Supreme Court's decision was "contrary to . . . clearly established federal law because the state court did not correctly identify and

[23](...continued)
perception of the circumstances...."); *Preston v. State,* 444 So. 2d 939, 946 (Fla. 1984) ("victim must have felt terror and fear as these events unfolded").  The Florida Supreme Court has upheld the HAC aggravator where the victim was conscious for merely seconds. *See Rolling v. State,* 695 So. 2d 278, 296 (Fla. 1997).

articulate the legal principles that govern the claim." *Id.* at 36. In particular, Petitioner maintains that the trial court's sentencing order violated "the capital sentencing scheme" approved by the United States Supreme Court in *Proffit v. Florida*, 428 U.S. 242. *Id.*

### (a) Exhaustion/Procedurally Defaulted:

Respondent contends this Ground is procedurally defaulted because the federal dimension of the claim was never raised in the State court; and, even if it wasn't procedurally defaulted, this claim is not cognizable in a federal habeas proceeding because it is purely an issue of State law. *Id.* at 75-76. In his direct appeal brief, Petitioner submitted that the sentencing order failed to comply with the State law requirement set forth in *Campbell v. State*, 571 So. 2 415 (Fla. 1990).[24] Irrespective of Petitioner's failure to present this claim in its present constitutionalized form to the Florida court, the claim is not proper for habeas review because it raises only a State law issue. *Id*. at 75. In the alternative, Respondent submits that the Florida court's disposition of this claim is neither contrary to, nor an

---

[24]On August 17, 2000, the Florida Supreme Court in *Trease v. State*, 768 So. 2d 1050, 1055 (Fla. 2000), expressly receded from its holding in *Campbell* and held that a trial court may assign no weight to a death penalty mitigator factor which is supported by the record. The *Trease* court recognized that its own previous holdings in *Wike v. State*, 698 So. 2d 817, 819 n.1, 823 (Fla. 1997) and *Sims v. State*, 681 So. 2d 1112, 1119 (Fla. 1996) permitted the trial courts to assign "little or no" weight to mitigators. *Id.*

unreasonable application of, clearly established federal law, and Petitioner has not established that the State Court ruling is an unreasonable determination of the facts in light of the evidence presented. *Id.* at 78–79.

Petitioner, in his direct appeal brief, presented this claim to the State court claiming that the trial court erred in contravention of Florida law only. Exh. B, at 75-76. In particular, Petitioner framed this issue as follows:

Point XII

> The trial court erred in its consideration of
> the mitigation evidence.

*Id.* at 75. Petitioner did not assert a federal constitutional violation in his direct appeal brief or cite to any federal law in support of this claim, citing instead only to the Florida Supreme Court decision in *Campbell v. State*, 571 So. 2d 415. *Id.* at 76. In support, Petitioner argued that the trial court's treatment of the 12 non-statutory mitigators as a single factor was impermissible and constituted "reversible error." *Id.* at 77. Further, Petitioner objected that the trial court only afforded "very little weight" to the mitigators. *Id.*

Based upon the record, the Court concludes that the federal dimension of this Ground was not fairly presented to the Florida Supreme Court. Therefore, this Ground has not been exhausted. Petitioner has shown neither cause and prejudice nor a fundamental miscarriage of justice and the issue is no longer capable of being

considered by the Florida courts.  Therefore, the Court finds that Ground 12 is procedurally defaulted.

**(b)   Alternative Merits Determination:**

Even if the Court deems this Ground exhausted, the Court agrees with Respondent that the claim does not raise a federal issue for purposes of habeas relief.  Whether the trial court complied with the tenets of Florida law raises only an issue of state, not federal law.  *Estelle v. McGuire*, 502 U.S. at 67-68; *Cabberiza v. Moore*, 217 F.3d at 1333.

Morever, Petitioner has not shown that the Florida Supreme Court's decision on this Ground was contrary to, or constituted an unreasonable application of governing precedent of the United States Supreme Court.  In the instant case, the Florida Supreme Court determined that the record revealed "sufficient competent evidence to support the trial court's weighing of the non-statutory mitigation." *Gudinas*, 693 So. 2d at 966.  Indeed, the Florida Supreme Court, in receding from its earlier holding in *Campbell*, recognized that prevailing United States Supreme Court precedent only required that the sentencing judge consider all mitigating evidence, but did "not preclude the sentencer from according the mitigating factor no weight." *Trease v. State*, 768 So. 2d at 1055 (citing *Hitchcock v. Dugger,* 481 U.S. 393, 394 (1987) and *Lockett v. Ohio,* 438 U.S. 586, 604 (1978)).

Thus, the Court finds that Ground 12 fails to raise a federal habeas issue. Alternatively, Petitioner has failed to demonstrate that the Florida Supreme Court's disposition of this claim was contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable application of the facts based upon the evidence of record. Thus, in the alternative, Ground 12 is denied as without merit.

**Ground 13**
**Rejection of the statutory mitigator that Gudinas' ability to appreciate the criminality of his conduct or to conform his conduct to the standards of law was substantially impaired renders the death sentence arbitrary and capricious in violation of the Fifth; Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.** [Petition at 14-15, Memorandum at 36-38]

Petitioner argues that the trial court wrongfully rejected "unrebutted expert testimony" establishing this mental health mitigator, by applying an "elevated standard." Petition at 14-15. Petitioner argues that the trial court essentially applied Florida's legal test of insanity in its evaluation of whether the mental health mitigator was applicable, instead of Florida Statute § 821.141(6)(f). As a result, Petitioner argues that the trial court's sentence of death was "arbitrary and capricious and violated [Gudinas'] rights to equal protection of the laws." Memorandum at 37. In addition to evaluating this mitigator under the "wrong standard," Petitioner claims that the trial court

misstated evidence and overlooked facts that established the presence of this mental health mitigator. *Id.* at 37-38.

   **(a)   Exhaustion/Procedurally Defaulted:**

   Respondents maintain that this Ground is precluded from habeas review because: (1) the Ground is procedurally defaulted because this claim was never raised in the State court in terms of a constitutional violation; and, (2) the Ground raises purely an issue of State law.  Response at 75-76.  Alternatively, Respondent argues  that the Florida court's disposition of this Ground is neither contrary to, nor an unreasonable application of, clearly established federal law, nor is the court's ruling an unreasonable determination of the facts in light of the evidence presented.  *Id.* at 79-80.  The Court agrees that this Ground is barred from federal habeas review.

   Petitioner included the "appreciate and conform" mental mitigation factor as a subsidiary to his claim raised in Point XII on direct appeal - - that the trial court erred in affording very little weight to the non-statutory mitigators.  Exh. B at 77-80. Therefore, Petitioner faulted the trial court for discrediting  the testimony of Petitioner's expert, Dr. O'Brian, based upon the trial judge's finding that there was insufficient evidence that Gudinas had consumed sufficient alcohol or marijuana to be "substantially impaired."  *Id.* at 77-78.  In short, Petitioner faults the court for considering the evidence at trial to establish whether Gudinas'

actions were influenced by his marijuana and alcohol use that night, as opposed to Dr. O'Brian's conclusion, which was based upon presumed facts.

Petitioner, however, makes no mention of any constitutional violation nor cites to any federal case law in support of this claim on direct appeal. *Id*. Thus, the Court finds that Petitioner has failed to exhaust the federal dimension of this Ground, has shown neither cause and prejudice nor a fundamental miscarriage of justice to excuse his default. Thus, because the issue is no longer capable of being considered by the Florida courts, the Court finds that Claim 13 is procedurally barred.

**(b)   Alternative Merits Determination:**

Even if the Court found that this Ground is not procedurally barred, the Ground, although wrapped in a federal claim, raises only a state law issue. Similar to the flaw in Ground 12, Petitioner attributes error to the state court on the basis that the court applied the wrong standard under Florida law in concluding that Petitioner had failed to demonstrate the existence of the "appreciate and conform" mental mitigator.

Further, even if the Court considered Petitioner's newly constitutionalized ground under the "arbitrary or capricious" standard so as to raise an independent due process or Eighth Amendment claim, Petitioner is not entitled to relief. The Florida Supreme Court rejected this Ground finding that:

Furthermore, we agree with the State that the trial court did not abuse its discretion in rejecting as a statutory mitigator Gudinas' claim that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirement was substantially impaired. In its sentencing order, the court acknowledged Dr. O'Brian's opinion that Gudinas' "ability to conform his behavior was impaired substantially on the basis of alcohol and his underlying psychological makeup." The court then rejected Dr. O'Brian's opinion as "too heavily based upon unsupported facts from what he was told other witnesses were going to testify about concerning the issue of intoxication." The court then noted that no witnesses testified that Gudinas was "substantially impaired to the extent that he did not know what he was doing." Indeed, the court then cited "credible evidence" that Gudinas "stealthily approached" Rachelle Smith's car at approximately 2 a.m. and attempted to gain entry. Therefore, we agree with the State that the court did not abuse its discretion in rejecting this mitigator, especially considering the evidence cited in its sentencing order and adduced at trial. *See Walls v. State*, 641 So. 2d 381, 390-91 (Fla. 1994)(stating that opinion testimony "gains its greatest force to the degree it is supported by the facts at hand, and its weight diminishes to the degree such support is lacking"), *cert. denied,* 513 U.S. 1130, 115 S.Ct. 943, 130 L.Ed.2d 887 (1995).

*Gudinas*, 693 So. 2d at 966-967.

The State court's factual findings are supported by the record and are entitled to deference by this Court. Petitioner bears the burden to rebut the State court's factual determination with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). He has not done so.

Thus, the Court finds that Petitioner has failed to demonstrate that the State court's rejection of this claim was based on erroneous facts. Nor has Petitioner demonstrated that the State court applied law contrary to clearly established federal

law, or applied clearly established federal law in a manner which was objectively unreasonable to such precedent.  Thus, in the alternative, the Court denies Ground 13 as failing to raise a federal issue capable of habeas review, or otherwise without merit.

**Ground 14**
**Ineffective assistance of counsel in the penalty phase denied Gudinas due process, a fair trial, and effective assistance of counsel guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.** [Petition at 14, Memorandum at 39-58]

Petitioner presented the following instances of counsel's ineffectiveness during the penalty phase: (1) failure to investigate and present evidence of the nature of Gudinas' placement in 15 different institutions and failure to hire a licensed social worker to explain to the jury the significance that Gudinas spent nearly 1/3 of his life in an institutional setting with the Massachusetts Department of Youth Services ("DYS") in which he did not receive the recommended help;  (2) failure to investigate and present information about Gudinas' family and background through Gudinas' aunt, Ellen Evans; (3) failure to investigate and present evidence of Gudinas' history of drug and alcohol abuse; (4) failure to investigate and present evidence of Gudinas' mental and emotional immaturity; (5) cumulative failure to investigate and present mitigation evidence; (6) failure to provide Dr. O'Brian with witness or deposition testimony necessary to substantiate his opinion that Gudinas' ability to conform his conduct to the requirements of the law was substantially impaired;

and, (7) ineffective for calling Gudinas' sister, Michelle, as a witness during the penalty phase. *Id.* at 52-57.  Petitioner contends that each of the deficiencies prejudiced Gudinas in that, if the above evidence was admitted, the balance of the mitigators and aggravators would have changed and resulted in a less-weighted recommendation of death; and cumulatively, the failure to investigate and present this evidence prejudiced Gudinas in that the jury  would have recommended life imprisonment.  Memorandum at 39-52.  Petitioner maintains that the Florida Supreme Court's decision on these issues was both contrary to and an unreasonable application of prevailing federal law as determined by the Supreme Court. *Id*. at 57-58.  Petitioner further argues that the Florida court failed to conduct a "cumulative analysis" in determining prejudice as mandated by *Williams v. Taylor*, 529 U.S. 362 (2000).

Respondents submit that the finding by the Florida Supreme Court of a procedural bar to claim (4), that counsel was ineffective for failing to investigate and introduce evidence of Gudinas' mental and emotional maturity, constitutes an independent state basis for denying this claim.  Response at 81.  As expressly recognized by the Florida Supreme Court, and for the reasons set forth previously, the Court agrees that this claim is procedurally barred.

As to the remaining claims, Respondent cites to the Florida Supreme Court's decision denying each claim and argues that the

decision, based "squarely on *Strickland v. Washington*, is neither contrary to, nor an unreasonable application of, clearly established federal law." *Id.* at 82-93. Respondent also argues that the State Court ruling is not an unreasonable determination of the facts in light of the evidence presented. *Id.* at 93.

As discussed *supra*, the applicable federal standard in evaluating an ineffectiveness of counsel claim is the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 688, which requires a petitioner to establish both deficient performance and prejudice as a result of the deficiency. *Id.* at 687. The Court instructed that in evaluating the first prong, whether counsel performed reasonably or deficiently:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Strickland,* 466 U.S. at 689 (internal citations and quotations omitted).

As to the second prong, the prejudice prong, the Supreme Court has cautioned that "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.  While a petitioner need not demonstrate it is "more likely than not, or prove by a preponderance of evidence," that the error by counsel affected the outcome.  *Id.* at 693-94. Instead,

> [t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694.  Indeed, if the state court rejects an ineffectiveness claim because the defendant failed to prove prejudice by a preponderance of the evidence, the state court's decision would be "contrary to" the law clearly established in *Strickland*.  *Williams v. Taylor,* 529 U .S. at 405-06.  In assessing whether there is a reasonable probability that, absent the errors, the factfinder would have found differently, the Court is advised that:

> a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.  Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry

must ask if the defendant has met the burden of showing
that the decision reached would reasonably likely have
been different absent the errors . . . . [T]he ultimate
focus of inquiry must be on the fundamental fairness of
the proceeding whose result is being challenged.

*Id*. at 695-96.

With *Strickland's* cautionary language in mind, the Court

considers the following Florida Supreme Court decision,[25] in

addressing the remainder of the claims on the merits:

The remainder of the issues on appeal concern counsels'
alleged ineffectiveness during the penalty phase. In our
prior opinion we described the penalty phase proceedings,
including the extensive evidence of mitigation presented
by defense counsel:

During the penalty phase, the State introduced
certified copies of Gudinas' Massachusetts
felony convictions. These included convictions
for burglary of an automobile; assault; theft;
assault with intent to rape; indecent assault
and battery; and assault and battery. These
offenses all occurred in the early 1990's.

Karen Ann Goldthwaite, Gudinas' mother,
testified that she had a difficult pregnancy
and delivery with Gudinas and that he had some
health problems during the first six months of
life. She also testified that he had extreme
temper tantrums as a small boy, although he
was never violent toward others. His teacher
reported that he was hyperactive at school,
sometimes throwing chairs and acting up. Mrs.
Goldthwaite had Gudinas evaluated at Boston
University when he was six. Thereafter, she
sought help from the Massachusetts Division of
Youth Services. Over the next several years,

---

[25]As noted earlier Petitioner was afforded a *Huff* hearing on
October 5, 1999 in connection with this Rule 3.850 claim, Exh. H3,
and on December 17, 1999, was afforded an evidentiary hearing on
each of the Rule 3.850 penalty phase ineffective assistance of
counsel claims addressed by the Florida Supreme Court. Exhs. H6,
H7,

Gudinas had 105 different placements through that agency. Mrs. Goldthwaite was advised that Gudinas should be placed in a long-term residential program, but she was never able to accomplish this [FN 6]. Because of his treatment in numerous facilities, Gudinas only completed his formal education through the fourth grade, although he eventually attained his GED. He also was diagnosed as having a low IQ. Finally, Gudinas' mother testified that he began drinking alcohol while a juvenile, smoked marijuana, and had used cocaine and LSD.

> [FN 6] His lengthiest treatment was a five-month program. He also spent nine days in a psychiatric ward during this time.

Michelle Gudinas, Gudinas younger sister, testified that their father put Gudinas' hand over an open flame as punishment for playing with matches. She also testified that on another occasion, as punishment for wetting his bed, their father made Gudinas stand in front of their house in his underwear wearing a sign that said "I will not wet the bed." Ms. Gudinas noted that Gudinas had a good relationship with his stepfather. She denied ever having any sexual contact with her brother or telling anyone she had. However, in rebuttal, Emmitt Browning, an Orlando Police Department investigator, testified that Ms. Gudinas told him she was at a party and went into a bedroom with her brother. She allegedly said her brother lay on top of her and began tearing her swim suit off before some of their cousins entered the room and pulled Gudinas off her.

Dr. James Upson, a clinical neuropsychologist, testified for Gudinas. He concluded that Gudinas was seriously emotionally disturbed at the time of the murder and that the "symbolism" of the crime indicated that he was "quite pathological in his psychological dysfunction." Dr. Upson testified that Gudinas has an IQ of 85, in the low-average range. Testing revealed that Gudinas has very

strong underlying emotional deficiencies. Dr. Upson explained that this type of person has a higher degree of impulsivity, sexual confusion and conflict, bizarre ideations, and manipulative behavior, tends to be physically abusive, and has the capacity to be violent. He noted that these behaviors escalate when the person is either threatened or loses control. Dr. Upson felt that Gudinas would probably be a danger to others in the future unless he was properly treated and that the murder was consistent with the behavior of a person with his psychological makeup.

Dr. James O'Brian, a physician and pharmacologist, was recognized by the trial court as an expert witness in the area of toxicology. He testified that Gudinas is unable to control his impulses in an unstructured environment and opined that Michelle's murder was impulsive. Gudinas told Dr. O'Brian that on the day before the murder, he ate marijuana "joints" at breakfast, at 1:30 p.m., five between 3 and 8 p.m., and another at 1 a.m. the following morning. Gudinas also reported that he drank alcohol between 1:30 and 3 p.m. and 9:30 p.m. and 2 a.m. the following morning. Dr. O'Brian testified that marijuana and alcohol remove inhibitions, thus allowing the underlying personality to show through. He stated that as the dosage increased, someone like Gudinas would not be able to control his "strong impulses." Based on his alcohol consumption and evaluation of Gudinas' underlying psychological makeup, Dr. O'Brian concluded that Gudinas' ability to conform his behavior to the requirements of the law was substantially impaired on the night of the murder.

*Gudinas*, 693 So. 2d at 958-59.

### WITNESS EVANS

In claim (3)(b), Gudinas alleges that trial counsel was ineffective during the penalty phase for failing to call Gudinas' maternal aunt, Ellen Evans, as a witness to present mitigating evidence. He relies on trial

counsel's fundamental duty to conduct a reasonable investigation into the defendant's background for possible mitigating evidence. *See Rose v. State*, 675 So. 2d 567, 571 (Fla.1996).

The Eleventh Circuit has succinctly outlined the analysis for determining whether counsel's failure to investigate and present mitigating evidence was deficient:

> First, it must be determined whether a reasonable investigation should have uncovered such mitigating evidence. If so, then a determination must be made whether the failure to put this evidence before the jury was a tactical choice by trial counsel. If so, such a choice must be given a strong presumption of correctness, and the inquiry is generally at an end. If, however, the failure to present the mitigating evidence was an oversight, and not a tactical decision, then a harmlessness review must be made to determine if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Thus, it must be determined that defendant suffered actual prejudice due to the ineffectiveness of his trial counsel before relief will be granted.

*Middleton v. Dugger*, 849 F.2d 491, 493 (11th Cir. 1988)(citation omitted).

Gudinas contends that in addition to testifying about facts that were already in evidence, Ms. Evans had knowledge of specific events that were not previously presented at trial: (1) that Gudinas' mother drank heavily while she was pregnant with him and during his childhood; (2) that Gudinas' mother physically abused him; (3) that Gudinas' mother worked in a "massage parlor" where customers could receive oral sex; (4) that his mother was put into a mental institution when Gudinas was a child; (5) that while Gudinas was in a state institution at age thirteen or fourteen, he was raped; (6) that Gudinas can sometimes get a "blank stare"; (7) that he has suffered from a lifelong foot ailment that affects his gait; and (8) that his mother allowed her boyfriends to beat Gudinas.

In finding that prejudice had not been established on this claim, the trial court stated:

> Even if Ms. Evans' testimony had been presented during the sentencing phase of the Defendant's trial, it is clear that very little would have been added to the sentencing presentation of defense counsel.  The evidence of the abuse by the Defendant's father and the fact that the Defendant's father cross-dressed were presented.  There was also substantial evidence presented as to the difficulty of the Defendant's childhood and his lack of treatment by the Massachusetts Youth Services. Any additional evidence that could have been provided by Ms. Evans would not have altered the outcome.

In its order denying relief, the trial court found that much of Ms. Evans' testimony related to events that had already been raised during the penalty phase, *i.e.*, that Gudinas' father was a cross-dresser, that Gudinas suffered physical abuse at the hands of his father, that Gudinas had a difficult childhood and that he was not properly treated by the Massachusetts Division of Youth Services (DYS).  The trial court also concluded that had Ms. Evans testified, the additional family background she would have provided would still have inevitably been overwhelmed by the aggravating factors that were presented: that Gudinas had been previously convicted of a violent felony; that the murder was committed during the commission of a sexual battery; and that the murder was especially heinous, atrocious, or cruel.  *See Breedlove v. State*, 692 So. 2d 874, 878 (Fla. 1997)(holding that even if mitigating circumstances had been established by the witnesses, the three aggravating factors the Court previously affirmed would have overwhelmed whatever mitigation Breedlove's friends and family members could provide).

At the 3.850 hearing, defense counsel LeBlanc testified that while he was researching Gudinas' background, he spoke several times with Ellen Evans to gather background information and that he considered what she told him in deciding what type of strategy to develop for the penalty phase.  Defense co-counsel Irwin testified that he did not recall whether Ms. Evans was available to testify at trial.  When asked at the 3.850 hearing why the defense

did not call Ms. Evans during the penalty phase, Mr.
LeBlanc stated that he did not remember.  Ms. Evans
testified that Gudinas' trial attorneys did not contact
her but that if she had been contacted, she would have
agreed to testify.

Although neither of Gudinas' attorneys were queried or
gave a reason for why they did not call Ms. Evans to
testify at trial, we note that this is not a case where
counsel failed to investigate or present evidence of
mitigation.  Counsel did investigate the defendant's
background and presented extensive evidence, including
voluminous juvenile records, of his troubled childhood.
We outlined the presentation of that evidence in our
prior opinion. *See Gudinas*, 693 So. 2d at 958-59.  In
fact, based upon counsel's presentation of mitigating
evidence, the trial court found one substantial statutory
mental mitigator as well as some twelve nonstatutory
mitigators.

We find no error in the trial court's factual
determination that Ms. Evans' testimony was in essence
cumulative to the mitigation evidence actually presented
at the penalty phase by experts and lay witnesses alike.
In fact, much of Ms. Evans' 3.850 hearing testimony was
similar to the mitigating evidence described in
ourprevious opinion affirming the conviction and
sentence.  We cannot fault the trial court for not
second-guessing defense counsels' work.  While it was
established that additional mitigating evidence existed,
that is not the standard *Strickland* contemplates in
evaluating counsel's performance.  We also find no error
in the trial court's determination that Gudinas has not
demonstrated prejudice according to *Strickland* because he
has not shown that if Ms. Evans had testified, her
testimony would have provided a reasonable probability,
sufficient to undermine confidence in the outcome, that
the outcome of the proceeding would have been different.
*See Strickland*, 466 U.S. at 694. [FN 7]

> [FN 7] In the sentencing order, the trial
> court found the following mitigators that
> related to Gudinas' upbringing and family
> life: (1) that his father dressed as a
> transvestite;   (2)   that   he   was
> developmentally impaired as a child; (3)
> that he was a caring son to his mother;
> and (4) that he was an abused child.  The

trial court gave "very little weight" to
the nonstatutory mitigating factors
relating to Gudinas' family life and
upbringing.

JUVENILE HISTORY

In claim (3)(c), Gudinas alleges that trial counsel was
ineffective for failing to investigate and present more
detail of Gudinas' institutional background with the DYS
both directly and through mental health experts.   He
complains of counsel's failure to emphasize the lack of
treatment he received as a juvenile.   The trial court
explained its evaluation of this claim:

[Dr. Upson] testified during sentencing and the
evidentiary hearing as to the sufficiency of the records
provided to him.   Furthermore, the doctor conducted a
psychological evaluation and screened the Defendant for
neuropsychological factors.   This evidence was presented
to the jury during sentencing.   The Court accepted Dr.
Upson's testimony that the Defendant was severely
disturbed as mitigating evidence.   The Defendant has not
shown what further effort of defense counsel could have
been exerted.

. . . Although part of defense counsel's strategy was to
emphasize that the Defendant was housed instead of
treated, defense counsel testified that they did not want
to present the Defendant's entire treatment history to
the jury.   The evidence presented by defense counsel was
consistent with the defense strategy and gave the jury
sufficient information without specifically asking what
effect the 105 placements would have had on the
Defendant.   The Defendant made no showing of either
deficient performance or prejudice as to this claim.

As the trial court noted and the record reflects,
Gudinas' attorneys did, in fact, investigate his
institutional background. The lawyers' testimony at the
3.850 hearing revealed that they were fully informed as
to Gudinas' institutional background and made an informed
choice to present his background in a limited fashion so
as to paint him in the best possible light, as someone
who was able to be rehabilitated, rather than someone who
had rejected numerous attempts at rehabilitation.

Although the sentencing court accorded the nonstatutory
mitigators very little weight, it did find that Gudinas

had the capacity to be rehabilitated, which is a mitigator that trial counsel testified he did not want to undermine by emphasizing Gudinas' institutional history in Massachusetts, as unsuccessful as it was.  Further, as the trial court noted, Dr. Upson testified at the 3.850 hearing that the additional institutional background information given to him before that hearing would not have changed the opinion he actually gave at trial.  The trial court summarized the opinions that Dr. Upson gave at trial: "That the Defendant did not have any significant cognitive dysfunction; that he was severely disturbed and extremely frightened; that he was caught up in a perpetual cycle of being punished; that at least two instances of pretty severe abuse had occurred; and that he had a very disruptive childhood."

This Court has stated, "Strategic decisions do not constitute ineffective assistance if alternative courses of action have been considered and rejected." *State v. Bolender*, 503 So. 2d 1247, 1250 (Fla. 1987).  Under this standard we cannot second-guess the trial court's determination after an evidentiary hearing that counsel was not deficient for not investigating and presenting Gudinas' institutional background in more depth and detail.  Further, even if we assume counsel was deficient for not investigating and presenting Gudinas' institutional background more thoroughly, Gudinas has not demonstrated error in the trial court's determination that prejudice was not established, because he has not made a showing sufficient to undermine confidence in the outcome of the penalty phase proceeding. *See Strickland*, 466 U.S. at 694.

Accordingly, based upon review of the extensive evidence offered both at trial and in the postconviction hearing, we do not find that Gudinas has established error by the trial court in its treatment of this claim.

SUBSTANCE ABUSE

In claim (3)(d), Gudinas alleges that trial counsel was ineffective during the penalty phase for failing to present a ten-year history of drug and alcohol abuse and for failing to hire a neuropharmacologist.  The trial court concluded that Gudinas did not suffer prejudice as to this claim.  The trial court stated:

The only new evidence that would have been
provided by a neuropharmacologist such as Dr.
Lipman was the Defendant's extensive history
of drug and alcohol abuse and an explanation
of the effect of drugs and alcohol on a person
who suffered from attention deficit.   Mr.
LeBlanc testified that he was aware that the
Defendant's background included a lot [sic]
alcohol and drug use. This extensive history
of substance abuse may have actually been
damaging to the Defendant, and would not have
altered the outcome of the jury's verdict.
Moreover, the testimony that the use of drugs
and alcohol by a person with attention deficit
may have produced uncontrollable behavior is
unpersuasive.       The  evidence  clearly
established that prior to the attack on
Michelle McGrath, the Defendant was attempting
to conceal himself when stalking Rachele [sic]
Smith, and he fled when Ms. Smith honked the
horn.  This evidence shows that the Defendant
was able to control himself.   As such, the
Court  finds  that  the  Defendant  cannot
demonstrate any prejudice which occurred as a
result of the failure of defense counsel to
present     the     testimony     of     a
neuropharmacologist.

After reviewing the testimony provided by Dr. Joseph
Lipman, the neuropharmacologist who testified at the
3.850 hearing for Gudinas, the trial court found that
"the outcome of the earlier proceedings would have been
unchanged as a result of his testimony." Upon review, we
conclude that the trial court did not err in finding that
confidence in the outcome of the original proceedings was
not substantially undermined by counsel's failure to
consult a neuropharmacologist.

Initially, we note, as we did in our earlier opinion,
that defense counsel did present the testimony of Dr.
James O'Brian, a physician and pharmacologist, at the
penalty phase.  Counsel also presented the testimony of
Dr. James Upson, a clinical neuropychologist.  At the
3.850 hearing, Dr. Lipman described his testing of
Gudinas as "minimal" and based his opinions largely on
Gudinas' self-report. The trial court concluded that Dr.
Lipman's opinion that Gudinas has neuronal damage and a
developmental brain problem conflicted with Dr. Upson's
trial testimony.  Further, the trial court found Dr.

Upson's testimony more credible than Dr. Lippman's
testimony in light of the extensive psychological testing
that Dr. Upson conducted on Gudinas. Dr. Upson conducted
a psychological evaluation of Gudinas, which required him
to see Gudinas three times, totaling approximately nine
and one-half hours.  Hence, there is evidentiary support
for the trial court's analysis and conclusion, and we
find no error in its analysis and denial of this claim.
[FN 8]

> [FN 8] In its denial of this claim,
> the trial court also noted that
> defense counsel was unable to
> present reliable evidence to
> corroborate Gudinas' claim that he
> used LSD on the night of the murder.
> We find no error in the trial
> court's conclusion in view of the
> lack of corroborating evidence to
> support the claim that Gudinas
> ingested LSD on the night of the
> murder.

## DR. O'BRIAN

In claim (3) (g), Gudinas alleges that trial counsel was
ineffective during his penalty phase for failing to
provide pharmacologist Dr. James O'Brian with necessary
background information. At trial, Dr. O'Brian opined that
on the night of the murder, Gudinas' ability to conform
his behavior to the requirements of the law was impaired
substantially on the basis of the alcohol and his
underlying psychological makeup.  On cross-examination,
he admitted that he was not given the actual trial
testimony of the witnesses, but rather he conceded he
relied upon defense counsel who told him that other
witnesses said Gudinas was intoxicated.

At the 3.850 hearing, attorney Irwin stated that he could
not recall why Dr. O'Brian did not sit through the actual
trial testimony, but he thought that it had to do with
the fact that Dr. O'Brian was from Connecticut.  Mr.
Irwin stated that he would have preferred to have Dr.
O'Brian sit in on the trial, but instead they had phone
conversations where he kept Dr. O'Brian abreast of the
witnesses' trial and deposition testimony.

In the sentencing order, the trial court rejected the
mitigator that the capacity of Gudinas to appreciate the

criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.  The trial court cited to four reasons for rejecting the mitigator.  One of the reasons was that Dr. O'Brian's testimony on this issue was not sufficient to establish the mitigator because it was "too heavily based upon unsupported facts from what he was told other witnesses were going to testify about concerning the issues of intoxication."

The reliability of Dr. O'Brian's testimony was not the only reason that the trial court rejected the mitigator that the capacity of Gudinas to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. The trial court stated in the sentencing order that it was not convinced that this mitigating circumstance existed for three other reasons: (1) no witnesses who saw Gudinas that night testified that he was substantially impaired to the extent that he did not know what he was doing; (2) Gudinas stealthily approached Rachelle Smith's car and attempted to gain entry to her vehicle, but fled once she sounded the horn; and (3) when Gudinas attacked Michelle McGrath, he took her to a place of concealment to perpetrate acts on her.  In its denial of this 3.850 claim, the trial court stated that "there was no further evidence presented at trial which would have provided a better foundation for [Dr. O'Brian's] opinion." Because a number of circumstances unrelated to Dr. O'Brian's testimony persuaded the trial court that this statutory mitigator was not present, we find no error in the trial court's determination that Gudinas has not shown that there is a reasonable probability, sufficient to undermine confidence in the outcome, that but for counsel's errors, the proceeding would have been different.  *See Strickland*, 466 U.S. at 694.

### SISTER'S TESTIMONY

In claim (3)(h), Gudinas alleges that trial counsel was ineffective during his penalty phase for calling Gudinas' sister, Michelle Gudinas, to testify because by calling her to testify, defense counsel opened the door to testimony regarding an alleged incident in which Gudinas attempted to sexually assault her.  At trial, Michelle Gudinas testified that: (1) their father purposely burned Gudinas' hand on a hot electric stove burner; (2) their father made Gudinas stand outside in the cold wearing a sign that said something like, "I will not wet the bed";

(3) their father was a cross-dresser; and (4) their father once beat Gudinas by banging his head against a wall. During the State's cross-examination of Michelle at trial, she denied that the incident was an attempted sexual assault and stated that Gudinas was trying to protect her.  The State called a rebuttal witness, Orlando police officer Emmitt Browning, who testified that when Michelle was thirteen or fourteen years old, she advised him that she was at a party and that after becoming intoxicated, she went into a bedroom with her brother and the next thing she could remember was her brother on top of her and her bathing suit torn off. According to Officer Browning, Michelle related that someone came in and caught them and pulled Gudinas off of her.

At the 3.850 hearing, attorney Irwin stated that he called Michelle to testify because she wanted to take the stand and he felt "almost an obligation" to let her speak on behalf of her brother, who was facing the death penalty.  Despite Gudinas' assertion of counsel's ineffectiveness for calling Michelle to testify, it does not appear he has established the prejudice prong on this claim.  As the trial court observed, this same information had already reached the jury during the State's cross-examination of Dr. Upson. [FN9]  For these reasons, we find no error in the trial court's determination that there was not a reasonable probability, sufficient to undermine confidence in the outcome, that the result of the proceeding would have been different.  *See Strickland*, 466 U.S. at 694.

> FN9 Dr. Upson testified at trial that his investigation revealed that a sexual act was committed between Gudinas and his fourteen year-old sister on one occasion when five people were at one person's apartment.

*Gudinas v. State*, 816 So. 2d at 1103-1110.

Under the first prong of *Strickland*, Petitioner must show with respect to each alleged error, that no competent counsel would have taken the action that his trial counsel took during the penalty phase.  Based upon a review of the State court record, the Court

does not conclude that counsels' actions were not reasonable considering all the circumstances. *Strickland*, 466 U.S. at 691. The record supports that the defense counsel walked a fine line with revealing enough information about Gudinas' past institutional history to demonstrate that Gudinas was seriously emotionally disturbed, without portraying Gudinas as incapable of rehabilitation. Significantly, the trial court found the statutory mitigator - - that Gudinas was under "the influence of an extreme mental or emotional disturbance" at the time of the murder, as well as the nonstatuory mitigator - - that Gudinas "has capacity to be rehabilitated." A13 at 618, 621. Further, if counsel had called Gudinas' aunt to testify, counsel could not have offered the testimony of Gudinas' mother, since the aunt's testimony was especially critical of and damaging to the mother's character. Thus, the various Christmas cards from Gudinas would not have come into evidence.

Even if counsel is deemed deficient on any or all of the grounds, the Court finds that "[t]he aggravating circumstances of this case were utterly overwhelming," *Strickland* at 2071, and Petitioner can not show prejudice. There is no reasonable probability, based on the totality of the circumstances, that the mitigators would have outweighed the aggravators and resulted in a sentence other than that which was recommended by a 10-2 margin.

Petitioner's argument that the jury would have recommended life imprisonment is no more than mere speculation.

Consequently, the Court finds that Petitioner has not made the required showing of either deficient performance or sufficient prejudice to sustain a finding that counsel was ineffective, and the Court finds that Petitioner's sentencing proceeding was not fundamentally unfair.   Thus, Ground 14 is denied.

**Ground 15**
**Guilt phase ineffective assistance denied due process, a fair trial, and assistance of counsel guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments.**
[Petition at 17, Memorandum at 58-62]

Petitioner alleges that counsel failed to adequately cross-examine witnesses, file appropriate motions, and make appropriate objections, resulting in prejudice to Petitioner.   Petition at 17.  Memorandum 2 at 19-22.   In particular, Petitioner contends that trial counsel was ineffective for failing to object to Jane Brand's testimony as a discovery violation, and failing to adequately cross-examine Brand on the stand.   Memorandum, at 58-59.  Petitioner claims that Brand's testimony was especially damaging, because her testimony placed Gudinas in the alley where the body was discovered.   *Id*. at 60.   Next Petitioner claims that trial counsel was ineffective for failing to adequately cross-examine Frank Wrigley.   *Id*.  Specifically, Petitioner faults counsel for failing to elicit from Wrigley what Wrigley meant when he testified that Gudinas "looked like he had a buzz on" and carried a cup in

his hand.  *Id*.  Petitioner argues that had counsel effectively cross-examined Wrigley, Wrigley could have established that Gudinas was intoxicated in order to establish the mitigator that Gudinas "could not conform his conduct to the requirements of the law." *Id*.  Petitioner also objects to trial counsel's failure to seek suppression of the "blood stained t-shirt" found at Fred Harris' apartment, where Gudinas was staying.  *Id*.  The State neither linked the blood to Ms. McGrath or to Gudinas.  *Id*. at 61. Petitioner asserts that the trial court would have had to suppress the t-shirt if counsel had moved for its suppression, and this piece of evidence was relied upon by the State as physical evidence connecting Gudinas to the crime.  *Id*.  Finally, Petitioner faults counsel for not moving for a mistrial after Frank Wrigley testified that he intended to call the police if Fred Harris, Gudinas' cousin, thought Gudinas was involved in the murder.  *Id*. at 60. Although counsel eventually moved for a mistrial and the trial court gave a curative instruction, Petitioner suggest that the lapse in time was ineffectual in reversing the damage done by the testimony.  *Id*.

Respondents argue that the State court's "denial of relief is neither contrary to, nor an unreasonable application of, clearly established federal law."  Response at 96.  Respondent also argues that Gudinas has not established that the State Court ruling is an

unreasonable determination of the facts in light of the evidence presented. *Id.*

Petitioner raised each of these claims in his Rule 3.850 motion. Exh. G3. The postconviction trial court denied relief, Exh. G4, and the Florida Supreme Court affirmed. *Gudinas*, 816 So.2d 1095; Exh. L.

With regards to each of Petitioner's claims,[26] the Florida Supreme Court, recognized that the *Strickland* analysis governs Petitioner's ineffective assistance of trial counsel claims, and affirmed the post-conviction court's summary denial of these claims, finding that the claims were refuted by the record:

> The trial court summarily denied claims (2)(b) and (2)(c), stating that from the record, it was apparent that Gudinas had not established deficient performance or prejudice in those claims. In issues that did not receive an evidentiary hearing, we must accept the factual allegations made by the defendant to the extent that they are not refuted by the record. *See Peede v. State,* 748 So. 2d 253 (Fla. 1999); *Valle v. State,* 705 So.2d 1331 (Fla. 1997). However, we have reviewed the claims and find that although they were legally sufficient on their face, the trial court did not err in concluding that they were conclusively refuted by the record.

*Gudinas*, 816 So.2d at 1101 n.6; Exh. L.

The postconviction court, after correctly citing *Strickland* as the proper "test for determining whether counsel has been

---

[26]The alleged ineffective claims relating to Brand and Harris were raised as claim 2(a), and the alleged failure to object to the bloody t-shirt was raised as claim 2(c) in Petitioner's appeal to the Florida Supreme Court.

ineffective," made the following findings with regards to these claims:

> The Defendant alleges that defense counsel failed to adequately cross examine Jane Brand, who was called by the State to establish the Defendant's presence at the scene of the crime. Ms. Brand testified that she briefly saw a person on the steps leading into the school where she worked. (T292) This school is adjacent to the alley in which the victim's body was found. Ms. Brand also testified that she recognized the Defendant as the person she saw on the steps after seeing him on television one month prior to the trial. (T302-03) The record clearly refutes the Defendant's claim that defense counsel was ineffective in cross examining Ms. Brand. During cross examination, defense counsel was able to elicit testimony from Ms. Brand that the individual on the steps had his back to her and that the entire encounter lasted only one to two minutes. (T303) It was also established that Ms. Brand did not get a good look at the person's face and that she was unable to provide sufficient information to allow an artist to complete a composite of the suspect. (T303-04) Further, when the person spoke, the witness did not notice an accent. (T305) The jury had already heard during the direct examination that the person Ms. Brand saw stood with his back to her and appeared to be rearranging his clothing, and that Ms. Brand turned away to give him privacy. (T294) Thus, defense counsel was not ineffective for failing to revisit this issue. With respect to the identification after seeing the Defendant on television, defense counsel pointed out that Ms. Brand had seen composites of the suspect prior to the television broadcast of the Defendant. (T306) From the record, it is apparent that defense counsel's cross examination was not deficient. Moreover, the Defendant cannot demonstrate prejudice.

> The ineffective assistance claim stemming from the failure of defense counsel to object to Ms. Brand's television identification because of a possible violation of the State's discovery obligation is fully addressed in the discussion of Claim V.

> . . .

> The Defendant's ineffective assistance allegations regarding the cross examinations of Culbert Pressley and Frank Wrigley are without merit. . . . Regarding the

cross examination of Frank Wrigley, the Defendant claims
that defense counsel failed to adequately develop Frank
Wrigley's testimony on the issue of the Defendant's level
of intoxication while at the club on the night of the
murder.  Defense counsel did elicit testimony that the
Defendant had a "buzz-on," and that the Defendant left
the club to smoke a joint. (T580, 583) The only portion
of Frank Wrigley's deposition testimony that was not
presented is his statement that the Defendant "was
walking kind of wobbly."  This minor distinction between
the deposition testimony and the trial testimony could
not satisfy either prong of the *Strickland* analysis.  *See*
*Strickland*, 466 U.S. at 687.

. . .

The Defendant claims that defense counsel was ineffective
for failing to object to the introduction into evidence
of a tee shirt found in Defendant's apartment. (T707)
This argument is based on the allegation that it wasn't
proven that he was wearing the shirt on the night of the
incident, and the blood on the shirt was never
established to be his nor the victim's.  In fact Dwayne
Harris testified that the Defendant was wearing the shirt
with the blood stains when he returned to the apartment
on the morning following the murder. (T685)  Dwayne
Harris also testified that the shirt was taken into
evidence by the police. (T692)  The Defendant is correct
that the testing of the blood stains was inconclusive.
However, the Defendant does not explain how this would
result in the evidence being irrelevant.  The fact that
a murder suspect returned home a few hours after the
murder with blood stained clothes is certainly relevant
evidence.  Thus, the Defendant has not established that
defense counsel's performance was deficient for failing
to object to the admission of the tee shirt, nor does he
demonstrate prejudice.

The Defendant's next argument is that defense counsel did
not make a timely objection and move for a mistrial
immediately after Frank Wrigley testified that he would
call the police if Fred Harris thought the Defendant had
committed the crime. (T579)  After Mr. Wrigley's
testimony was completed, defense counsel moved for a
mistrial. (T600)  Defense counsel and the State presented
arguments outside the presence of the jury, and the
motion for a mistrial was denied. (T600-04)  Instead, a
curative instruction was given. (T606)  The failure of
defense counsel to object contemporaneously did not

result in any prejudice to the Defendant because the
motion for a mistrial was heard despite the lack of a
contemporaneous objection.  The comment did not affect
the fairness and reliability of the proceeding or the
outcome.

. . .

. . . the Defendant claims that the State violated its
discovery obligation by failing to inform the defense
that a State witness, Jane Brand, saw the Defendant on
television prior to trial and as a result, claimed to be
able to identify him. . . .

With respect to Jane Brand's ability to identify the
Defendant, the claim is without merit because it had no
effect on the proceedings.  Defense counsel was able to
cross examine Jane Brand as to her later ability to
identify the Defendant, and the witness admitted that she
did not get a sufficient look at the suspect to do a
composite as the time of her original viewing of him.
(T303).  Furthermore, Rachelle Smith, John Chisari, and
Mary Rutherford made identifications of the Defendant.
(T263, 349, 369)  As a result, even if the State did
commit a violation of the discovery rules, the result
would not have effected the outcome of the proceedings.

Exh. G4 at 2, 3-4, 7-8, and 21.

Both the postconviction court and Florida Supreme Court
correctly applied *Strickland* in evaluating Petitioner's claims of
trial counsel's ineffectiveness.   The State court's finding of
fact as to each of the aforementioned claims is conclusively
supported by the record and is entitled to deference.  Petitioner
bears the burden of rebutting the state court's factual findings
with clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  Here,
Petitioner has failed to demonstrate that the State court relied on
incorrect facts, applied law contrary to established United States
Supreme Court precedent, or unreasonably applied *Strickland*.

Accordingly, the Court finds Petitioner is not entitled to any relief on Ground 15.

### Ground 16
**Florida rules barring juror interviews violate equal protection principles, and the First, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**
[Petition at 16, Memorandum at 62-63].

Petitioner challenges the constitutionality of Rule 4-3.5(d)(4) of the Rules Regulating the Florida Bar,[27] which prohibits Florida counsel from contacting jurors after a trial to inquire as to possible grounds for constitutional relief.  Petition at 18.  Specifically, Petitioner argues that his "inability to fully explore possible misconduct and jury biases prevent him from showing the unfairness of his trial."  Memorandum 2 at 23.

**(a)   Procedurally Barred:**

Respondents argue that the Florida Supreme Court's finding of a procedural bar constitutes an independent state basis for denying relief without federal consideration of the merits.  Response at 97.  The Court agrees.

---

[27]Rule 4-3.5(d)(4) states, in relevant part that:

A lawyer shall not ... after dismissal of the jury in a case with which the lawyer is connected, initiate communication with or cause another to initiate communication with any juror regarding the trial except to determine whether the verdict is subject to legal challenge; provided, a lawyer may not interview jurors for this purpose unless the lawyer has reason to believe that grounds for such challenge may exist.

Petitioner raised this claim for the first time in his Rule 3.850 motion, Exh.G3 (claim 4), and the Florida Supreme Court denied the claim as "procedurally barred because it should have been raised on direct appeal." *Gudinas v. State*, 816 So. 2d 1095, 1101 nn.3,4 (Fla. 2002). Therefore, the Court cannot consider this Ground as it is procedurally barred. *Siebert v. Allen*, 455 F.3d at 1271; *Spencer v. Sec'y, Dep't of Corr*., 609 F.3d at 1178.

Petitioner asserts that the Florida Supreme Court's decision that the issue should have been raised on direct appeal "is wrong." Reply at 14-15. The Court recognizes that The Florida Supreme Court has regularly deemed a challenge to the Bar Rule's prohibition against interviewing jurors a direct appeal issue. *See Ragsdale v. State*, 720 So.2d 203, 205, n. 2 (Fla. 1998); *Power v. State*, 886 So. 2d 952, 957 (Fla. 2004). Thus, Gudinas has not demonstrated any "cause and prejudice" for his procedural default, nor has he claimed that his appellate counsel was ineffective for failing to raise this claim on direct appeal. Consequently, the Court finds that Ground 16 is procedurally barred.

(**b**)  **Alternative Merits Determination**:

In the alternative, Gudinas has presented no evidence or made any legal argument demonstrating that the Florida Supreme Court's and the trial court's rejection of this claim is contrary to or an unreasonable application of federal law. Indeed, rules which prevent attorney interviews or other contact with jurors, or

preclude juror testimony where the subject inheres in the verdict itself, have repeatedly been applied in criminal cases and upheld as constitutional. *See, e.g., Tanner v. United States,* 483 U.S. 107, 119 (1987) (stating "[s]ubstantial policy considerations support the common law rule against the admission of jury testimony to impeach a verdict" and applying Federal Rule of Evidence 606(b) to exclude testimony of juror misconduct to impeach jury verdict, including jurors' alleged use of drugs and alcohol); *U.S. v. Griek*, 920 F.2d 840, 843 (11th Cir. 1991); *Sims v. Singletary,* 155 F.3d 1297, 1312-13 (11th Cir. 1998)(applying Florida rule that juror testimony is not relevant unless it concerns matters that do not essentially inhere in the verdict itself). *See also LeCroy v. Sec'y, Dept. of Corr.,* 421 F.3d 1237, 1260 (11th Cir. 2005).

Accordingly, Gudinas has not shown that the Florida Supreme Court's decision, in affirming the State postconviction court's order denying Petitioner relief on this claim, was contrary to, or an unreasonable application of, clearly established law. Consequently, the Court finds Ground 16 procedurally barred, or in the alternative, without merit.

**Ground 17**
**Cumulative error denied Gudinas due process, a fair trial and appeal, guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**
[Petition at 17-18; Memorandum at 63-65].

Petitioner argues that cumulative error denied him due process, a fair trial, and appeal guaranteed by the Fifth, Sixth,

Eighth, and Fourteenth Amendments.   Petition at 18.   Specifically, Petitioner argues that the aggregate of the "errors, individually and cumulatively, in Tommy Gudinas' trial, penalty phase, sentencing, and direct appeal deprived him of effective assistance of counsel, his right to counsel, assistance of competent mental health assistance, a fundamentally fair trial, due process of law, and individualized sentencing under the Fifth, Sixth, Eighth, and Fourteenth Amendments."   Memorandum 2 at 26.

Respondents argue that the State's decision is entitled to deference and that the State's decision is neither contrary to, nor an unreasonable application of, clearly established federal law. Response at 97.   Respondents further argue that to "the extent that this claim may be based on claims that are procedurally defaulted because they were not raised timely in State court, the 'cumulative error' rubric does not override well-settled procedural default law."   *Id.* at 97-98.     Finally, Respondents argue that AEDPA governs the case, not *Brecht*, as the Petitioner suggests.   *Id.* at 98.   The Court agrees.

Here, the Florida Supreme Court found this claim to be without merit because they determined that no errors occurred.   *Gudinas*, 816 So.2d at 1101; Exh. L.   "A determination of a factual issue made by a State court shall be presumed to be correct.   The applicant shall have the burden of rebutting the presumption of

correctness by clear and convincing evidence." 28 U.S.C. § 2254(e).

No Supreme Court authority recognizes ineffective assistance of counsel "cumulative error" as a separate violation of the Constitution, or as a separate ground for habeas relief. *See Lorraine v. Chyle*, 9 F.3d 416, 447 (6th Cir.) ("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."), *amended on other grounds*, 307 F.3d 459 (6th Cir. 2002), *cert. denied,* 538 U.S. 947 (2003); *Forrest v. Fla. Dep't of Corr.*, 342 Fed. Appx. 560, 565 (11th Cir. 2009), *cert. denied,* ___ U.S. ___, 129 S.Ct. 932 (2009). The Supreme Court has stated that "there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *U.S. v. Cronic*, 466 U.S. 648, 659, fn. 26 (1984). Further, in *Spears v. Mullin*, 343 F.3d 1215, 1251 (10th Cir. 2003), the court stated, "[b]ecause the sum of various zeroes remains zero, the claimed prejudicial effect of their trial attorneys' cumulative errors does not warrant habeas relief."

This Court also previously engaged in a sub-claim by sub-claim analysis of Petitioner's Grounds and ultimately found each to be without merit. Unless the trial was rendered fundamentally unfair, the Eleventh Circuit Court of Appeals has declined to entertain "cumulative error" claims. *See Cargill v. Turpin*, 120 F.3d 1366,

1386-87 (11th Cir. 1997).  For reasons previously articulated in this Order, the Florida Supreme Court has determined, and this Court agrees, Gudinas' trial was not rendered fundamentally unfair. Therefore, Ground 17 is denied.

**Ground 18**
**The Judgment and sentence of death must be vacated in light of *Ring v. Arizona*.**

Petitioner argues that the judgment against him and death sentence must be vacated in light of *Ring v. Arizona,* 536 U.S. 584 (2002).  Petition at 19.  Petitioner raised this Ground in his successive motion for postconviction relief pursuant to Rule 3.851. Exh. Q.  The Florida Supreme Court, in denying Petitioner relief, noted that it had "rejected similar *Ring* claims and has held that the aggravators of prior violent felony and 'murder committed during the course of an enumerated felony' comply with a *Ring* analysis because they involve facts already submitted to and found by a jury." *Gudinas v. State*, 879 So.2d 616, 618 (Fla. 2004); Exh. W.

Respondents argue that the United States Supreme Court held on June 24, 2004 (well before Gudinas filed his Petition and Memorandum) that *Ring* is not retroactively applicable to final cases like this one, citing *Schiro v. Summerlin*, 542 U.S. 348, 358 (2004).  Response at 98-99.  Thus, Respondents submit that Petitioner's *Ring* claim is without merit based upon governing federal law. *Id.*  The Court agrees.

In *Ring v. Arizona*, the United States Supreme Court held that a sentencing judge, sitting without a jury, may not find an aggravating circumstance necessary for the imposition of the death penalty; the Sixth Amendment required that those circumstances be found by a jury. *Ring*, 536 U.S. at 585, 609. This Court need not determine whether Gudinas' death sentence imposed pursuant to Florida law is unconstitutional under *Ring*, because *Ring* is not retroactive to death penalty cases already final on direct review. *Schriro v. Summerlin*, 542 U.S. at 358. Gudinas' death sentence became final on October 20, 1997, when the United States Supreme Court (case number 97-5684) denied Petitioner's petition for writ of certiorari after the Florida Supreme Court issued its affirming decision in *Gudinas v. State*, 693 So. 2d 953 (Fla. 1997). *Gudinas v. Florida*, 522 U.S. 936 (1997); Exh. F-3. Therefore, Ground 18 is denied as without merit.

ACCORDINGLY it is hereby

**ORDERED and ADJUDGED:**

1.    The Petition for Writ of Habeas Corpus, as amended (Doc. #25), is **DENIED** for the reasons set forth herein.

2.    The Clerk of the Court shall enter judgment accordingly; terminate any pending motions; and, close this file.

## CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL *IN FORMA PAUPERIS* DENIED

**IT IS FURTHER ORDERED** that Petitioner is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas

corpus has no absolute entitlement to appeal a district court's denial of his petition.   28 U.S.C. § 2253(c)(1).   Rather, a district court must first issue a certificate of appealability (COA).   *Id.*   "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2).   To make such a showing, petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) or, that "the issues presented were adequate to deserve encouragement to proceed further."   *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Petitioner has not made the requisite showing in these circumstances.

Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** in Fort Myers, Florida, on this 30th day of September, 2010.

Charlene Edwards Honeywell
United States District Judge

SA: hmk
Copies: All Parties of Record